Shaw C. J.
delivered the opinion of the Court. Questions affecting the construction of the constitution of the Commonwealth, and the political and civil rights and privileges of the citizens depending on it, are entitled to the fullest and most deliberate consideration, when drawn into judicial discussion. Upon a correct decision of these, the security and harmony of our well balanced system of free and popular government mainly depend.
It has been regarded as a question of doubt and difficulty, whether upon strict principle, a public officer who acts honestly and according to the best of his judgment, in the dis *492 charge of his duty, and who through such honest mistake and error of judgment, denies to a citizen his right of voting, should be answerable, in an action for damages. But considering the utility of having a plain and perfect remedy, in case of so much importance, and the difficulty which there would be, in bringing questions of this sort to the test of judicial determination, were not each individual citizen permitted to vindicate his own particular right as a voter, before a competent judicial tribunal; and considering that the question of damages will always be in the hands of a jury, who will take care to give slight damages, when the object is principally to settle a really disputed and doubtful right, and when the municipal officers have acted honestly and in good faith, it has been decided upon great considerations of public policy, that such an action may be sustained. Kilham v. Ward, 2 Mass. R. 236 ; Lincoln v. Hapgood, 11 Mass. R. 350. This therefore is not now considered an open question.
These decisions, however, apply only to selectmen, whose duty it is both to determine upon the claim of the voter, and to receive his vote, and who by refusing to receive his vote do at the time refuse to allow his claim. It perhaps may be a different question, whether the same right of action exists against the warden and inspectors of wards, under the city charter, who, as the law stands, are merely ministerial officers, authorized to ascertain the identity of those voters, whose names are borne on the lists of voters delivered to them by the mayor and aldermen, and to receive the votes of such persons. By the terms of the act, they have no authority to add any name to the list, or to receive the vote of any person whose name is not on the list, or to consider or determine on the qualifications of any person offering himself as a voter. It may therefore be still considered as an unsettled question, under the peculiar organization of the city of Boston, whether the remedy of a citizen, who has been deprived of his right of voting, is by an action against the warden and inspectors, or the mayor and aldermen, or against either of them respect vely, as it shall appear upon the circumstances of each particular case, that the loss of such right has been occasioned by the *493 failure of the one or the other, in the discharge of their respective and appropriate duties.
But the present case has been argiied upon grounds more genera], and entirely independent of the particular organization of the city. The clause in § 24 of the act incorporating the city provides, that prior to every election, it shall be the duty of the mayor and aldermen to make out lists of all the citizens of each ward, qualified, &c., in the manner in which the selectmen and assessors of towns are required to make out similar lists of voters. And it shall be the duty of the mayor and aldermen to deliver such list to the clerk of the ward, to be used by the warden and inspectors at such election, and no person shall be entitled to vote at such election, whose name is not borne on such list. And to prevent frauds and mistakes, it is made the duty of the inspectors to take care that no person shall vote at such election, whose name is not so borne on the list of voters. These provisions, except so far as they are modified in order to conform to the peculiar organization of the city, are substantially like those of the general law regulating elections. St. 1822, c. 104, § 2. This pro vides the manner in which selectmen are required to make out and publish lists of the qualified voters. It then requires that the selectmen or moderator shall be provided with a complete list as aforesaid at such elections, and no person shall vote at any election whose name shall not have been previously placed on said list.
In the particular provision, in regard to which the validity of the law is now called in question, viz. that no person shall vote at an election, whose name is not previously placed on the list of voters, the mode of regulating elections in the city and in all the towns of the Commonwealth, is precisely the same. It appears by the facts agreed, in the present case, that the name of the plaintiff was not borne on the list of voters at the time his vote was rejected, and it does not appear that he had previously examined the lists, or applied to have his name inserted on the lists. By the plain and express terms of the law, the plaintiff, under these circumstances, was prohibited from voting ; by asserting the right, therefore, the plaintiff puts in issue the validity of those provisions of the *494 law. And the case for the plaintiff is put upon the ground, that such a provision is a restraint upon the right of voting, inconsistent with the privileges secured by the constitution to the citizens, that these constitutional privileges are above and beyond the control of the legislative power, and that all such laws are therefore unconstitutional, inoperative and void. This is the question which the Court are now called upon to decide.
On the part of the plaintiff it is contended, that the constitution itself has provided the qualifications of voters, that the law in question prescribes a new and additional qualification, that as such it operates as a restraint upon the larger privilege allowed by the constitution itself, which cannot be done by an act of legislation.
On the other hand it is argued, that the right of suffrage being secured by the constitution to persons having certain specified qualifications of age, sex, residence, property and contribution to public burdens, it was for the constitution itself either to direct in detail the time, place and manner, in which this constitutional right should be exercised, or to leave this to be regulated by law ; that so far as this is done by the consti tution itself, in plain terms or by necessary implication, it is binding and conclusive, but where it is not so done, it is competent for the legislature to provide for the exigency, by a law acting uniformly throughout the Commonwealth.
And this Court is of opinion, that in all cases, where the constitution has conferred a political right or privilege, and where the constitution has not particularly designated the manner, in which that right is to be exercised, it is clearly within the just and constitutional limits of the legislative power, to adopt any reasonable and uniform regulations, in regard to the time and mode of exercising that right, which are designed to secure and facilitate the exercise of such right, in a prompt, orderly and convenient manner. Such a construction would afford no warrant for such an exercise of legislative power, as, under the pretence and color of regulating, should subvert or injuriously restrain the right itself.
A familiar instance of the case of providing by law for the exercise of one of the most important rights of election, is *495 found in one of the earliest acts passed under the constitution. If there be any one portion or member of our frame of government more important than another, it is surely that which provides for an equal representation of the people in the house of representatives. And yet the constitution made no provision in regard to the time or place at which meetings should be held, how they should be called or regulated, or how the result should be ascertained. It fixed the qualifications of voters with precision, and left all the rest to be regulated by law. Accordingly, within a few months after the adoption of the constitution, an act was passed, reciting this part of it, and that no provision was made for convening the voters, for regulating the meetings, or for making returns of the persons elected, and it then proceeds to make the needful regulations upon this subject. St. 1780, c. 26, since repealed. Here it is manifest, that although the qualifications of electors of representatives were prescribed by the constitution, yet without a provision by law, for regulating the exercise of that right, the constitution itself would be nugatory. It cannot be doubted, that this is a just exercise of the power of the legislature, to provide for the exercise of one of the most important rights of suffrage, and without which the qualified electors would be unable to exercise the right itself, to any useful or effectual purpose.
Another obvious exercise of the same power is found in St. 1798, c. 31, § 3, which provides, that it shall not be lawful for the selectmen or assessors of any town, district or plantation, presiding at a meeting for either of the elections therein recited, including those of governor and lieutenant-governor, senators and representatives, electors of president and vice-president of the United States and representatives to Congress, to receive any vote, unless delivered in writing by the voter in person.
As to many of those elections, particularly that of representatives, the constitution is silent upon the question, whether the votes shall be given personally or by proxy, viva voce or by ballot. But for this law, all qualified voters might claim the right of voting viva voce or by proxy. But we think it cannot be doubted that this is a just exercise of legislative *496 power, providing an easy and reasonable mode of exercising the constitutional right, and one calculated to prevent error and fraud, to secure order and regularity in the conduct of elections, and thereby give more security to the right itself.
That part of the constitution which provides for the election of senators and counsellors, goes more into detail. It directs that a meeting of the inhabitants of each town shall be held on the first Monday of April annually, (since altered to another day,) to be called and warned as therein required, and prescribes the qualifications of voters. It then goes on to provide, that the selectmen of the several towns shall preside at such meetings impartially, and shall receive the votes of all the inhabitants of such towns present and qualified to vote for senators.
Whether under the provision that the selectmen shall preside and receive the votes of all qualified voters, such selectmen are made constitutionally judges of the qualifications ol the voters, or whether it would be competent for the legislature to vest that authority in some other body, it is not necessary now to decide. It seems that sometimes the legislature have entertained the opinion, that it was competent for them to provide by law for another mode of deciding on these qualifications, by vesting the authority in the towns or in the assessors. But talcing it for granted, that the authority of judging of the qualifications of voters is by this provision of the constitution vested in selectmen of towns, as long as that form of municipal organization remains, which seems the more proba ble and sound construction of the constitution, still the constitution is wholly silent in regard to the time, place and manner, in which such selectmen shall receive evidence of the qualifications of voters, and how the result shall be ascertained, and the evidence of it manifested and preserved.
The right of any individual person, claiming the privilege of voting, may involve an inquiry into the fact of citizenship, sex, age, domicile within the Commonwealth, domicile within the town or district, the payment of taxes, exemption by law from the payment of taxes, and the fact of his being a pauper or under guardianship, or otherwise. All these are questions of fact, open to proof of various kinds, and sometimes, though *497 rarely, requiring considerable research and investigation. Is there any thing in the above recited provision of the constitution which requires the selectmen to go through this investigation during the progress of the polling, and whilst many other citizens, whose right is unquestioned, and proved by their names being previously entered on the list, are waiting to give in their ballots and retire ? There is no express requirement, and we think there is no implication, arising either from the terms of the constitution or from the nature and purposes of the right of voting, which obliges the selectmen to perform this duty, whilst in the actual performance of other positive duties, required by the express direction of the constitution, and in the careful, exact and prompt performance of which, the public, the whole body of qualified voters, have a deep interest.
The constitution, by carefully prescribing the qualifications of voters, necessarily requires that an examination of the claims of persons to vote, on the ground of possessing these qualifications, must at some time be had by those who are to decide on them. The time and labor necessary to complete these investigations must increase in proportion to the increased number of voters; and indeed in a still greater ratio in populous commercial and manufacturing towns, in which the inhabitants are frequently changing, and where of necessity many of the qualified voters are strangers to the selectmen.
If then the constitution has made no provision in regard to the lime, place and manner, in which such examination shall be had, and yet such an examination is necessarily incident to the actual enjoyment and exercise of the right of voting, it constitutes one of those subjects, respecting the mode of exercising the right, in relation to which it is competent to the legislature to make suitable and reasonable regulations, not calculated to defeat or impair the right of voting, but rather to facilitate and secure the exercise of that right.
And this Court is of opinion, that the provision in the general law regulating elections, and that in the act incorporating the city, which require that the qualifications of voters shall be previously offered and proved, in order to entitle them to vote, that their names shall be entered upon an alphabetical *498 register or list of voters, is highly reasonable and useful, calculated to promote peace, order and celerity in the conduct of elections, and as such to facilitate and secure this most precious right to those who are by the constitution entitled to enjoy it; that it cannot be justly regarded as adding a new qualification to those prescribed by the constitution, but as a reasonable and convenient regulation of the mode of exercising the right of voting, which it was competent to the legislature to make ; and therefore that these legal enactments, not being repugnant to the constitution, are valid and binding laws, to which both voters and presiding officers at elections; are authorized and bound to conform.
In the manner in which these lists are framed, effectual care seems to be taken to secure the rights of electors. The lists are first to be prepared by the collectors of taxes, and submitted to the selectmen, who are to revise and publish the same for the inspection of all interested. They are to be in session a sufficient length of time, shortly before the election, and for an hour at least on the day of meeting and before the opening of the meeting, to receive evidence of the qualifications of those whose names may have been omitted. Nothing therefore but the carelessness or neglect of the voter himself, or some accident not attributable to the law or the officers who are to execute it, can deprive him of the power of proving his right, and exercising his[1] privilege ; and against these it would be difficult, either by legal or constitutional provisions, entirely to guard.
It was contended in the argument for the plaintiff, that the act incorporating the city of Boston, and providing for the mode of conducting elections therein, makes no provision for the publication of the lists of voters prior to each election, so that it is impossible for a voter to know whether his name is borne on the list or not, and that without any neglect of his own, his right of voting may be defeated, and therefore that this provision is not a reasonable regulation in regard to the exercise of his right. But we think that the law is not obnoxious to this objection. The act of incorporation (Si. 1821, c. 110, § 24,) provides that prior to every election of city officers or of any officers under the government of the United *499 States or ol this Commonwealth, it shall be the duty of the mayor and aldermen to make out lists of all the citizens of each ward qualified to vote in such election, in the manner in which selectmen and assessors of towns are required to make out similar lists of voters, &.c.
The amendment of the constitution in 1820, had previously invested the general court with authority to erect city governments, to grant them powers and privileges not repugnant to the constitution, to prescribe the manner of calling and holding public meetings of the inhabitants in wards or otherwise, for the election of officers under the constitution, and the manner of returning the votes given at such elections.
It was therefore manifestly within the power of the legislature to provide for the holding of elections in wards. The act had previously provided (§ 12) that all the powers of the selectmen, either under general or special laws, should be vested in the mayor and aldermen. We have previously seen that it was one of the powers incident to the office of selectmen, to make out lists of votes for their respective towns, previously to each election, and to determine upon the qualifications of voters. There was therefore a manifest fitness and propriety in giving this power to the mayor and aldermen, upon the incorporation of the city. It had a manifest tendency to promote the'purity and regularity of elections, that this authority should be vested in one body, for the whole city, instead of being intrusted to the officers of wards. It would tend to promote uniformity in the rules of evidence and of decision upon the claims of voters ; and to prevent fraudulent attempts to vote in different wards. To accomplish these objects, however, where the election was to be conducted in twelve different places, it was still more necessary, than in towns, that the lists should be closed before the polling commenced. Still if the provision of this law is such as to afford the voter no opportunity to know seasonably whether his name is on the list or not, and to have it inserted if previously omitted, it would constitute a serious objection to its validity But as already said, we think it is not open to this objection By the provision already cited, the mayor and aldermen are to make out lists of voters, for each ward, in the manner in which *500 selectmen and assessors of towns are required to make out similar lists of voters.
This act was passed before the general act, already cited, regulating elections. But at the time the act incorporating the city was passed, two other acts were in force, making similar provisions in regard to the making out lists of voters, but dividing the duty between the selectmen and assessors. St. 1802, c. 116 ; St. 1813, c. 68.
It may be a question upon the construction of the clause cited from the city charter, whether in referring to the manner in which lists of voters are required to be made by selectmen and assessors of towns, it looked forward to such laws as should from time to time be passed upon this subject, or whether it regarded the duties of selectmen and assessors, as they were then established by law. To the purposes of the present inquiry, the point is wholly immaterial, because, by the laws as they then stood, and by the act passed in the following year, it was specially required that the lists should be posted up a certain time previous to the election, and that the selectmen or assessors should be in session immediately before or on the day of the election, so as to give to every voter the means of knowing whether his name was borne on the list, and opportunity to place it there if omitted. And we are of opinion, that by this reference to the laws then in force, and by requiring the mayor and aldermen to make up their lists of voters in the manner in which assessors and selectmen of towns are required to make similar lists, all the reasonable and beneficial provisions of those laws prescribing the duties of the officers, and securing the privileges of the voters, were adopted and incorporated in the city charter, and became binding and obligatory upon the mayor and aldermen, as effectually as if they had been re-enacted and extended to them in terms. All the remarks, therefore, made before in reference to the reaso: ableness of these regulations of the right of voting in towns, apply with equal force in regard to the clause in the act of incorporation, regulating the right of voting within the city.[1]

Plaintiff nonsuit.

 See Mussey v. White, 3 Greenl. 290.