King **NELSON**; Karla Hudson; Charis Austin; Walter R. Saumier; Charlotte Czarnecki; Kyle Austin, Plaintiffs–Appellants,

v.

Candice S. **MILLER**, in her official capacity as Secretary of State for the State of Michigan, Defendant–Appellee.

No. 97–1155.

United States Court of Appeals, Sixth Circuit.

Argued March 11, 1998.

Decided March 25, 1999.

Diane C. Smith (argued and briefed), Amy E. Maes (argued and briefed), Michigan Protection & Advocacy Service, Lansing, Michigan, for Plaintiffs–Appellants.

Gary P. Gordon, Asst. Attorney Gen. (briefed), Office of the Attorney General Habeas Corpus Division, Denise C. Barton, Asst. Attorney Gen. (argued and briefed), Office of the Attorney General, Public Employment & Elections Division, Lansing, Michigan, for Defendant–Appellee.

Jessica Dunsay Silver (argued and briefed), Seth M. Galanter (briefed), U.S. Department of Justice, Civil Rights Division, Appellate Section, Washington, D.C., for Intervenor.

Samuel Bagenstos, Mark L. Gross, U.S. Department of Justice, Civil Rights Division,

Appellate Section, Washington, D.C., for Amicus Curiae.

Before: KRUPANSKY, NELSON, and BATCHELDER, Circuit Judges.

## OPINION

BATCHELDER, Circuit Judge.

This class action was brought on behalf of all blind registered voters in the State of Michigan who cannot independently read or mark election ballots provided for them. The Plaintiffs claim that the Michigan Constitution provides all Michigan voters with a right to "secrecy of the ballot." Because the Secretary of State, according to Plaintiffs, is "the Chief Election Officer for the State of Michigan ha[ving] the ultimate responsibility to administer the Michigan Election Law," (J.A. at 12 (Compl.)), and has refused to implement methods by which the Plaintiffs could cast their votes unassisted by another person,[1] they argue that she is violating their rights under the Americans with Disabilities Act of 1990, 42 U.S.C.A. §§ 12101–02, 12131–50 (West 1995 & Supp.1998) (the "ADA"), and the Rehabilitation Act of 1973, 29 U.S.C.A. § 794 (West 1999) ("RA").[2] Plaintiffs request that she be permanently enjoined from failing to implement such methods in the future.[3]

The district court granted the Defendant's motion for dismissal pursuant to FED. R. CIV. P. 12(b)(6), finding that Michigan's current voting law, which permits blind voters to have third-party assistance of their choosing in marking their ballots, complies with the ADA and RA and thus that the Plaintiffs had failed to allege facts upon which relief could be granted under either act. First, the court found that the ADA and RA, statutes that apply generally to disability-based discrimination, needed to be read in conjunction with older, specific congressional acts dealing with voting rights for the disabled, namely the Voting Rights Act of 1965 (as amended in 1982), 42 U.S.C.A. § 1973aa–6 (West 1994) ("VRA"), and the Voting Accessibility for the Elderly & Handicapped Act of 1984, 42 U.S.C.A. § 1973ee–1 (West 1994) ("VAEH"), insofar as they involved the elections of federal officers. *Accord In re Thirteen Ballots Cast in 1985 Gen. Election*, 209 N.J.Super. 286, 507 A.2d 314, 315 (Law Div.1985) (finding the VRA to apply to only federal, rather than state and local, elections); *NAACP v. Philadelphia Bd. of Elections*, No. CIV. A. 97–7085, 1998 WL 321253, at *3 (E.D.Pa. June 16, 1998) (unpublished) ("The VAEH deals only with federal elections. Congress could amend the VAEH to apply to non-federal elections, but has not chosen to do so."). Citing 42 U.S.C. § 12201,[4] the court stated that Congress did not intend for the ADA to displace the Federal Voting Rights Acts. The court then noted that the VRA specifically required that a blind voter be provided assistance by a person of his or her

---

1. Plaintiffs' complaint alleges the existence of "inexpensive technologies that are currently in commercial use which permit persons who are blind to read and mark ballots without involving a third party, including brailled ballot overlays or templates, taped text or phone-in voting systems." J.A. at 6 (Compl.).

2. Appellee does not challenge the claim that she is the appropriate party to sue for alleged violations of ADA or RA regarding access to voting. *Cf. Lightbourn v. County of El Paso, Tex.*, 118 F.3d 421, 432 (5th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 700, 139 L.Ed.2d 643 (1998) (reversing district court's injunction, awarded on identical claim made by blind Texas voters, because the Texas Secretary of State has no duty to ensure local election officials' compliance with ADA).

3. The United States Constitution provides, "This Constitution, and the Laws of the United States

which shall be made in Pursuance thereof; ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, § 2. Accordingly, this case raises the constitutional issue of whether Michigan's current system of aid to blind voters complies with laws validly enacted by Congress under the limited powers granted to it by the People of the United States, U.S. CONST. preamble., amend. X.

4. The ADA provides:

Nothing in this chapter shall be construed to invalidate or limit the remedies, rights, and procedures of any Federal law or law of any State or political subdivision of any State or jurisdiction that provides greater or equal protection for the rights of individuals with disabilities than are afforded by this chapter.

42 U.S.C. § 12201(b).

choice when voting (with certain exceptions not material here), 42 U.S.C. § 1973aa–6, and that the Senate Report accompanying the VAEH (which requires polling places to be "accessible" to handicapped voters), specifically noted " 'that any minimal effect on the privacy of those who are elderly or handicapped is more than offset by the expanded opportunities for participation in the political process.' " *Nelson v. Miller*, 950 F.Supp. 201, 203 (W.D.Mich.1996) (quoting S. REP. No. 98–590, at 7 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2801, 2807). Accordingly, to the extent that these statutes applied to the Defendant, the court concluded that the Defendant could not be said to have violated them by providing the Plaintiffs with the same type of meaningful assistance prescribed by them.

Second, as for state and local elections not covered by the VRA and VAEH, the court reasoned that nothing in the language of the ADA or RA indicated that voting *privacy* was a benefit Congress sought to protect under them, *see id.* at 204 n. 3, and that Congress did not intend the ADA and RA to extend to blind voters in state and local elections anything more than it had already extended to them in federal elections through the VRA and VAEH. *See id.* at 205 n. 4; *cf. Philadelphia Bd. of Elections*, 1998 WL 321253, at *4 ("Defendants are not required to provide the specific procedures authorized under the VAEH, but the decision to do so is a reasonable modification to comply with the ADA.... The defendants' provision of the alternative ballot procedures [authorized by the VAEH] to qualified individuals with disabilities fulfills their obligation under the ADA....").

On appeal the United States entered the case as amicus curiae in support of the Plaintiffs/Appellants, disagreeing with the district court's premise that the ADA and RA do not require that more be extended to Michigan's blind voters than already extended to them via the VRA and VAEH. When the Defendant/Appellee alleged Eleventh Amendment immunity and challenged the constitutionality of the ADA in her appellate brief, the United States was permitted to intervene. The United States argues that the Eleventh Amendment does not bar the Plaintiffs' action, and that the ADA is not unconstitutional.

For the following reasons, we AFFIRM the judgment of the district court, but do so on grounds different from those advanced below. First, we find that Eleventh Amendment immunity does not bar this suit, because this action falls within the *Ex parte Young* exception. Second, we hold that we need not reach the question of whether Congress abrogated Eleventh Amendment immunity by enacting the ADA pursuant to § 5 of the Fourteenth Amendment. Third, we hold that Plaintiffs' complaint must be dismissed because Plaintiffs can state no facts tending to establish that they are being denied any right in violation of the ADA and the RA.

## I. ELEVENTH AMENDMENT IMMUNITY

◼ The Eleventh Amendment to the United States Constitution provides, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. While "the text of the Amendment would appear to restrict only the Article III diversity jurisdiction of the federal courts," *Seminole Tribe v. Florida*, 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the Supreme Court has long " 'understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition ... which it confirms,' " *id.* (quoting *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991)). That presupposition is "that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State," *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), "unless [it] consent[s] to [such suits] in unequivocal terms or unless Congress, pursuant to a valid exercise of power, unequivocally expresses its intent to abrogate the immunity," *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371

(1985). Therefore, under Eleventh Amendment immunity jurisprudence, courts have recognized that there is no Eleventh Amendment bar in three instances: (1) where the state has consented to suit; (2) where the application of *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), and its progeny is appropriate; or (3) where Congress has abrogated the state's immunity. It is undisputed that the state has not consented to this suit; hence, we will address only the *Ex parte Young* exception and the abrogation exception.

## A. The Ex parte Young *Exception*

■ Appellants have not brought suit against the State of Michigan. Rather, they have sued only the Secretary of State in her official capacity as the state officer charged with enforcing Michigan's election laws. Thus, the question arises as to whether the Secretary of State can be cloaked with the State of Michigan's Eleventh Amendment sovereign immunity in this instance. "The Eleventh Amendment bars a suit against state officials when 'the state is the real, substantial party in interest.' " *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (quoting *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945)). While it is clear to us that it is MICH. COMP. LAWS ANN. § 168.751, and not the Secretary of State's enforcement of that statute, that is the heart of this litigation, and thus that it is the State of Michigan, and not the Secretary of State, who is the real party in interest,[5] we feel constrained to deny Appellee's Eleventh Amendment challenge on the basis of *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908),

and its progeny, even though, as one able commentator has put it, "[o]ne does not go to the trouble of amending the Constitution in order to alter the caption on the complaint," David P. Currie, Ex Parte Young *After* Seminole Tribe, 72 N.Y.U. L. REV. 547, 548 (1997).

■ "Whether a suit against State officials in their official capacity is deemed to be against the State depends on whether the plaintiff seeks 'retroactive' or 'prospective' relief." *Doe v. Wigginton*, 21 F.3d 733, 736 (6th Cir.1994). When the relief sought is "retroactive," it usually takes the form of money damages, and thereby significantly implicates the governmental entity itself. In such an instance the "official capacity claim . . . is deemed to be against the State whose officers are the nominal defendants, [and] the claim is barred by the Eleventh Amendment." *Id.* at 737. On the other hand, when the relief sought is prospective injunctive relief that would "merely compel[ ] the state officer['s] compliance with federal law in the future," *id.*, then such a request "is ordinarily sufficient to invoke the *Young* fiction." *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 281, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997).

■ Although an affirmative injunction ordering the Secretary to offer voting devices assuring full privacy to blind voters would affect the state treasury because it would require Michigan to purchase such devices, this potential effect does not remove this case from the *Ex parte Young* exception. As the Supreme Court noted in *Edelman*:

> [Post-*Ex parte Young* ] cases from this Court have authorized equitable relief which has probably had greater impact on state treasuries than did that awarded in

**5.** See also *Pennhurst*, 465 U.S. at 101–02, 104 S.Ct. 900 (citations and internal quotations omitted), which stated:

"[T]he general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter." . . . And, as when the State itself is named as the defendant, a suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief.

But see *Futernick v. Sumpter Township*, 78 F.3d 1051, 1055 (6th Cir.), *cert. denied*, — U.S. —, 117 S.Ct. 296, 136 L.Ed.2d 215 (1996), which

articulated this Court's understanding of how we are to view this language in *Pennhurst*:

It is error to read the language about the 'party in interest' as an extension of Eleventh Amendment immunity to actions seeking injunctive relief against a state officer who is violating federal law. . . . To the extent the text of *Pennhurst* supports such a reading, it is overruled by *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 . . . (1989). *Will* reaffirmed that state officers who are violating a federal law may *always* be sued for purely injunctive relief—"capacity" and "party in interest" are irrelevant.

Ex parte Young. In *Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), Arizona and Pennsylvania welfare officials were prohibited from denying welfare benefits to otherwise qualified recipients who were aliens. In *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), New York City welfare officials were enjoined from following New York State procedures which authorized the termination of benefits paid to welfare recipients without prior hearing. But the fiscal consequences to state treasuries in these cases were the necessary result of compliance with decrees which by their terms were prospective in nature. State officials, in order to shape their official conduct to the mandate of the Court's decrees, would more likely have to spend money from the state treasury than if they had been left free to pursue their previous course of conduct. Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in Ex parte Young, *supra*.

*Edelman*, 415 U.S. at 667–68, 94 S.Ct. 1347.

This Circuit has applied the *Edelman* analysis in a case similar to the case before us. In *Doe v. Wigginton*, the plaintiff sought, *inter alia*, to require prison authorities to adopt a policy providing for HIV testing of prison inmates either routinely or upon the inmate's request. 21 F.3d 733 (6th Cir.1994). Citing *Edelman*, this Court found that plaintiff's claims for declaratory relief were not barred by Eleventh Amendment immunity, even though granting the relief, *i.e.*, requiring prison officials to provide HIV tests to inmates upon request, would have an "ancillary" effect on the state treasury. *Id.* at 737 (citing *Edelman*, 415 U.S. at 668, 94 S.Ct. 1347); *see also Thomson v. Harmony*, 65 F.3d 1314, 1320–21 (6th Cir.1995) (finding that prospective relief of reinstatement to job, future support in research, and expungement of personnel record would cause only minimal and ancillary expense to state trea-

sury); *Lee v. Western Reserve Psychiatric Habilitation Ctr.*, 747 F.2d 1062, 1066 (6th Cir.1984).

As in *Doe v. Wigginton*, because the claims at issue here "only seek 'compliance in the future,' they are claims for prospective relief. They accordingly are not deemed to be against [the State], and hence are not barred by the Eleventh Amendment." *Doe*, 21 F.3d at 737 (citing *Edelman*, 415 U.S. at 668, 94 S.Ct. 1347; *Ex parte Young*, 209 U.S. at 159–60, 28 S.Ct. 441).

### B. The Abrogation Exception

Although we do not reach the merits of this exception because we have found that *Ex parte Young* applies to give the federal courts jurisdiction in this case, we feel constrained at least to address the issue because of the procedural posture of this appeal.

Citing the Eleventh Amendment immunity analysis of *Seminole Tribe*, Appellee contends that even if Congress explicitly intended through the ADA to abrogate the states' immunity from suit, the ADA is not a valid exercise of power pursuant to which abrogation of sovereign immunity may be accomplished. This is so, she argues, because Congress exceeded the power given to it under § 5 of the Fourteenth Amendment by interpreting the Equal Protection Clause to provide more protection to disabled Americans than the Supreme Court has interpreted it to provide, *see City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Therefore, Appellee concludes, Title II of the ADA is not a valid exercise of power through which Congress could abrogate Eleventh Amendment immunity, and thus the federal court lacks jurisdiction over this action.

We note that Appellee has conflated two distinct arguments here. Whether Congress has acted "pursuant to a valid exercise of power"—the second of the two *Seminole Tribe* questions,[6] *see* 517 U.S. at 55, 116

---

**6.** "In order to determine whether Congress has abrogated the States' sovereign immunity, we ask two questions: first, whether Congress has 'unequivocally expresse[d] its intent to abrogate the immunity,' and second, whether Congress has acted 'pursuant to a valid exercise of power.' " *Seminole Tribe*, 517 U.S. at 55, 116 S.Ct. 1114 (citations omitted) (quoting *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985)).

S.Ct. 1114—requires a determination of whether "the Act in question [was] passed pursuant to a constitutional provision granting Congress the power to abrogate," *id.* at 59, 116 S.Ct. 1114. The Court explicitly held in *Seminole Tribe* that "through the Fourteenth Amendment, federal power extended to intrude upon the province of the Eleventh Amendment and therefore that § 5 of the Fourteenth Amendment allowed Congress to abrogate the immunity from suit guaranteed by that Amendment." *Id.* It is clear from the language of the ADA that Congress passed the ADA pursuant to both its power to enforce the Fourteenth Amendment and its power to regulate commerce. *See* 42 U.S.C. § 12101(b)(4).

 The Secretary appears to argue that Title II of the ADA is not a valid exercise of Congress's power under § 5 of the Fourteenth Amendment, because Title II provides protection to a classification not included within those to which the Fourteenth Amendment extends; therefore, the ADA does not abrogate the states' sovereign immunity. Whether the ADA was passed pursuant to a provision of the Constitution that grants Congress the power to abrogate the states' immunity from suit is a different question from whether the substantive provi-

sions of the ADA are a valid exercise of Congress's power to enforce the Fourteenth Amendment. The latter question has been the subject of considerable debate since the Supreme Court's decision in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (striking down the Religious Freedom Restoration Act as exceeding Congressional authority under § 5 enforcement power because Congress had sought to extend to religious adherents more protection than the Court had found warranted under the Free Exercise Clause of the First Amendment).[7] It is not necessary for us to reach this issue because, as we explain below, we conclude that Appellants cannot state a claim of violation of the ADA. *See Burton v. United States,* 196 U.S. 283, 295, 25 S.Ct. 243, 49 L.Ed. 482 (1905) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case."); *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g, P.C.,* 467 U.S. 138, 157, 104 S.Ct. 2267, 81 L.Ed.2d 113 (1984) ("It is a fundamental rule of judicial restraint . . . that this Court will not reach constitutional questions in advance of the necessity of deciding them."); *Spector Motor Serv., Inc. v. McLaughlin,* 323

---

The parties in the case before us agree that the first of these questions is not at issue, and that Congress's intention to abrogate the states' sovereign immunity is unequivocally expressed in the ADA.

7. In an evenly-split *en banc* decision, the Eighth Circuit affirmed a district court decision which held the ADA to be a valid exercise of Congress's § 5 power. *Autio v. AFSCME, Local 3139,* 140 F.3d 802 (8th Cir.1998), *aff'g Autio v. Minnesota,* 968 F.Supp. 1366, 1370–72 (D.Minn.1997). Another panel of the Eighth Circuit adopted *Autio 's* holding, but that decision was vacated by a grant of rehearing *en banc* and has yet to be decided. *Alsbrook v. City of Maumelle,* 156 F.3d 825, 830 (8th Cir.), *vacated by grant of reh'g en banc,* (8th Cir. Nov. 12, 1998). The Fifth and Eleventh Circuits have both found the ADA to be a valid enactment of Congress's § 5 powers, *see Coolbaugh v. Louisiana,* 136 F.3d 430, 432–38 (5th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 58, 142 L.Ed.2d 45 (1998); *Kimel v. State of Florida Bd. of Regents,* 139 F.3d 1426, 1433 (11th Cir.), *cert. granted,* —— U.S. ——, 119 S.Ct. 901, 142 L.Ed.2d 901 (1999); *Kimel,* 139 F.3d at 1441–44 (Hatchett, J., concurring in part and dissenting in part), but have done so in split decisions

containing strong dissents which found the ADA invalid after *City of Boerne. See Coolbaugh,* 136 F.3d at 439–42 (Smith, J., dissenting); *Kimel,* 139 F.3d at 1445–46, 1448–49 (Cox, J., concurring in part and dissenting in part). The Ninth Circuit has solidly found the ADA to be a valid enactment under § 5 of the Fourteenth Amendment. *Clark v. California,* 123 F.3d 1267, 1270–71 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 2340, 141 L.Ed.2d 711 (1998). The district courts outside of these circuits have split on this issue, *see, e.g., Anderson v. Department of Pub. Welfare,* 1 F.Supp.2d 456, 467–68 (E.D.Pa.1998) (finding the ADA to be a valid exercise of Congress's § 5 power), *Brown v. North Carolina D.M.V.,* 987 F.Supp. 451, 455–59 (E.D.N.C.1997) (finding the ADA to be an invalid exercise of Congress's § 5 powers), *overruled by Lamb v. John Umstead Hosp.,* 19 F.Supp.2d 498 (E.D.N.C.1998), and our own Southern District of Ohio has issued divergent opinions concerning it, *compare Thrope v. Ohio,* 19 F.Supp.2d. 816, 820–22 (S.D.Ohio 1998) (finding ADA valid § 5 enactment), *with Nihiser v. Ohio Envtl. Protection Agency,* 979 F.Supp. 1168, 1172–76 (S.D.Ohio 1997) (finding "accommodation" provisions of ADA and RA to be invalid exercises of Congress's § 5 power).

U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable."); *Clinton v. Jones,* 520 U.S. 681, 117 S.Ct. 1636, 1642, 137 L.Ed.2d 945 (1997) ("Th[is] doctrine of avoidance ... is applicable to the entire Federal Judiciary, not just to this Court ...."); *see also Jean v. Nelson,* 472 U.S. 846, 854, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985) (same); *Firestone v. Galbreath,* 976 F.2d 279, 286 (6th Cir.1992) ("Deciding constitutional issues only after considering and rejecting every nonconstitutional ground for the decision is a 'fundamental rule of judicial restraint.'" (quoting *Three Affiliated Tribes,* 467 U.S. at 157, 104 S.Ct. 2267)).

## II. VIOLATION OF THE ADA AND/OR RA

■ This Court reviews a trial court's FED. R. CIV. P. 12(b)(6) dismissal *de novo. Columbia Natural Resources, Inc. v. Tatum,* 58 F.3d 1101, 1109 (6th Cir.1995). A court should not dismiss a plaintiff's complaint under Rule 12(b)(6) unless, after construing the complaint in the light most favorable to the plaintiff and accepting all factual allegations as true, the court determines that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Id.* While the court must accept the plaintiff's *factual* allegations as true, "[t]he trial court need not accept as true [a plaintiff's] legal conclusions." *Lewis v. ACB Bus. Servs., Inc.,* 135 F.3d 389, 405 (6th Cir.1998).

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C.A. § 12132 (West 1995). Similarly, the RA states, "No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial

assistance...." 29 U.S.C.A. § 794 (West 1999). "[T]he two statutes are quite similar in purpose and scope," *McPherson v. Michigan High Sch. Athletic Ass'n, Inc.,* 119 F.3d 453, 459 (6th Cir.1997) (en banc), such that "'[t]he analysis of claims under the [ADA] roughly parallels those brought under the [RA],'" *id.* at 459–60 (quoting *Monette v. Electronic Data Sys. Corp.,* 90 F.3d 1173, 1177 (6th Cir.1996)).

■ The Michigan Constitution provides: The legislature shall enact laws to regulate the time, place and manner of all nominations and elections, except as otherwise provided in this constitution or in the constitution and laws of the United States. The legislature shall enact laws to preserve the purity of elections, *to preserve the secrecy of the ballot,* to guard against abuses of the elective franchise, and to provide for a system of voter registration and absentee voting.

MICH. CONST. art. 2, § 4 (emphasis added). Appellants claim that this creates a constitutional right to secrecy of the ballot, or a "secret voting program," for all of Michigan's voters. This is a legal conclusion, rather than a factual allegation, which this Court need not accept as true for purposes of reviewing the district court's 12(b)(6) dismissal.

Michigan statutory law provides: When at an election an elector shall state that the elector cannot mark his or her ballot, the elector shall be assisted in the marking of his or her ballot by 2 inspectors of election. If an elector is ... disabled on account of blindness, the elector may be assisted in the marking of his or her ballot by a member of his or her immediate family or by a person over 18 years of age designated by the blind person.

MICH. COMP. LAWS ANN. § 168.751 (West 1989). Because the Secretary of State refused their request to implement a system by which blind voters could vote without third-party assistance of their choosing, Appellants allege that she has denied Michigan's blind voters the benefit of complete secrecy of the ballot enjoyed by Michigan's sighted voters. Accordingly, Appellants claim that the State has violated the ADA and RA by "exclud[ing

them] from participation in or ... den[ying them] the benefits of" the State's constitutionally mandated "secret voting program."

Appellants readily admit that their ADA and RA claims depend entirely upon their being denied access, because of their disability, to this "secret voting program" that they claim the Michigan Constitution mandates. Indeed, they argue explicitly in their brief that the district court's misunderstanding of this specific aspect of their claim is what led to its erroneous ruling:

> The District Court in its opinion concluded that because Plaintiffs were asking the court to find that a blind voter's privacy in casting a ballot is a protected right under the ADA or RA " .... the facts alleged by the Plaintiffs cannot establish that the Defendant has violated the ADA or the R.A." Plaintiffs never alleged that Congress intended the ADA or RA to specifically impose a right to secret ballot voting for blind voters *in all states*. For this reason, the District Court Rule 12(b)(6) dismissal was inappropriate.

Appellant's Br. at 10 (emphasis added). It later reiterates this as being the lynchpin of their claim:

> Both constitutionally and statutorily, the State of Michigan's voting program is mandated to be a secret voting program. *It is within these mandates that Plaintiffs claim voters have a right to cast a secret ballot. Plaintiffs never claimed that the ADA or RA provided in and of itself a private right of voters who are blind or visually impaired to cast a secret ballot.* Rather, Plaintiffs claim that the ADA and RA mandate that persons with disabilities not be excluded from programs because of their disability.

Appellant's Br. at 18–19 (emphasis added).

Appellants' claim, therefore, can be stated another way: the special benefits extended to Appellants under MICH. COMP. LAWS. ANN. § 168.751 do not comply with the constitutionally required benefits to which they are entitled, and which sighted voters receive, under MICH. CONST. art. 2, § 4. For such a claim to be true, Appellants essentially must show that the Michigan legislature, by providing blind voters with third-party voting aid, rather than unassisted voting aid, has violated the Michigan Constitution's mandate that it "enact laws to ... preserve the secrecy of the ballot," MICH. CONST. art. 2, § 4. The question, then, is whether the Michigan Constitution requires more secrecy than the Michigan legislature has provided for in MICH. COMP. LAWS ANN. § 168.751.

The Michigan Supreme Court, if faced with this question, certainly could interpret the language of Article 2, § 4, as requiring the state legislature to modify its election laws when the technology becomes available that would allow blind voters to exercise their voting rights without third-party assistance. Not only might the text of Article 2, § 4, support such a reading, but so also could the following Constitutional Convention Comment made concerning Article 2, § 4:

> This is a version of Sec. 8, Article III, of the present [1908] constitution and vests in the legislature the full authority over election administration, subject to other provisions of this constitution and to the U.S. constitution and laws. The legislature is specifically directed to enact corrupt practices legislation.

> The provision regarding the secrecy of the ballot is designed *to insure that in the future the legislature will be empowered to adopt any new techniques of casting and recording voter choices, so long as the secrecy of the ballot is preserved.*

MICH. COMP. LAWS ANN., Constitution of 1963, art. 2, § 4 (Convention Comment) (West 1985). The court could just as easily, however, interpret the "secrecy of the ballot" requirement of Article 2, § 4, as being satisfied by the present system of allowing blind voters the assistance of a person of their choosing. Article 2, § 4 of the Michigan Constitution clearly vests in the legislature the power to enact the laws to preserve the undefined "secrecy of the ballot;" as the Comment notes, Article 2, § 4 thus empowers the legislature to interpret how best to do the job. Between the two plausible outcomes we are inclined to conclude, for the following reasons, that the Michigan Supreme Court

would find that the statute fulfills the requirements of Article 2, § 4.

First, no Michigan court has ever found that MICH. COMP. LAWS. ANN. § 168.751 violates the state constitution's mandate that the legislature "preserve the secrecy of the ballot." Older cases, however, have mentioned that permitting blind voters to have someone aid them in voting is perfectly in keeping with the purpose of Article 2, § 4's predecessor (MICH. CONST. art. 7, § 6 (1850)), which was preserving "the purity of elections." *See, e.g., Common Council v. Rush,* 82 Mich. 532, 46 N.W. 951, 953 (1890) ("The secrecy of the ballot is the great safeguard to the purity of elections.") In fact in *Rush,* a voting law which was silent on the issue of third-party assistance for disabled voters was specifically interpreted to *permit* such assistance so as to avoid having to strike the voting law down as unconstitutional, which the court indicated it would have had to do had it been unable to read such assistance into the act. *Id.* at 954. This holding certainly indicates to us that third-party voting assistance to the blind has, at least in the past, been seen by the Michigan Supreme Court as complying with the requirements of the Michigan Constitution, rather than violating them.

In *Ellis ex rel. Reynolds v. May,* 99 Mich. 538, 58 N.W. 483 (1894), the Supreme Court of Michigan addressed the constitutionality of a statute that allowed voters, who could not read English or because of physical disability could not mark their ballots, to have assistance in marking their ballots. Specifically, the statute required those who could not read English to take an oath swearing their illiteracy before they would be permitted to receive assistance in marking their ballots; the respondent contended that this requirement was unconstitutional because it placed an unreasonable restriction upon the right to vote. *Id.* at 484. Affirming the constitutionality of the statute, the court said, "The regulations are to preserve the purity of the election, and *we see no constitutional objections to them as prescribed by the act.*" *Id.* at 485 (emphasis added). It further stated:

The law aims to secure secrecy in the ballot, and does not attempt to disenfranchise any voter. *At the expense of this secrecy, and in order to enable voters who are physically incapacitated from marking their ballots, the law provides a method for such aid, as well as to those who cannot read the English language. The law does not deprive these voters of any right, but rather secures to them aid in voting intelligently;* it is plain and simple in its provisions. Every voter, however illiterate or however much incapacitated physically, has a method pointed out by which he may exercise his right of franchise. The law does not shut off any class of voters from the ballot, *and, we think, was designed by the legislature to accomplish the purpose specified in the constitution.*

*Id.* at 485–86 (emphasis added). Thus, whatever the phrase "secrecy of the ballot" in the Michigan Constitution means, the only Michigan precedent we could find even tangentially addressing the issue indicates at least a previous understanding that third-party assistance to blind voters was within its ambit.

Second, we note that the Michigan Supreme Court has "long ... held that a statute comes clothed in a presumption of constitutionality," *Cruz v. Chevrolet Grey Iron, Div. of GMC,* 398 Mich. 117, 247 N.W.2d 764, 766 (1976); *see also Caterpillar, Inc. v. Department of Treasury, Revenue Div.,* 440 Mich. 400, 488 N.W.2d 182, 187 (1992); *Johnson v. Harnischfeger Corp.,* 414 Mich. 102, 323 N.W.2d 912, 916 (1982); *W.A. Foote Mem'l Hosp., Inc. v. Kelley,* 390 Mich. 193, 211 N.W.2d 649, 654 (1973). "Since 1844 ... it has been a frequently repeated rule in construing statutes in [Michigan] that a statute should not be declared unconstitutional unless the conflict between the Constitution and the statute is *palpable and free from reasonable doubt.*" *Evans Prods. Co. v. Fry,* 307 Mich. 506, 12 N.W.2d 448, 457 (1943) (emphasis added). "The act of the legislature must be *plainly at variance* with some provision of the constitution before a court will so declare it. *Doubtful questions* will be resolved *in favor of the validity of the legislative act.*" *Id.* (emphasis added; quoting *Attorney General v. Reading,* 268 Mich. 224,

256 N.W. 432, 434 (1934)); *see also Cruz,* 247 N.W.2d at 766 ("Therefore, one challenging the constitutionality of a statute assumes the burden of overcoming the presumption.").

The Michigan Supreme Court employs this rule of deference out of respect for the principle of inter-branch comity:

> A statute is to be treated with that deference due to the deliberate action of a coordinate branch of government and is to be set aside only when it is apparent it was the result of action which the Legislature was prohibited by the Constitution from taking. It is only thus the right of the people to rule may be preserved from legislative absolutism and effect be given to the fundamental maxim of American jurisprudence that sovereignty resides in the people.

*C.F. Smith Co. v. Fitzgerald,* 270 Mich. 659, 259 N.W. 352, 355 (1935). " 'It is but a decent respect, due to the wisdom, the integrity, and the patriotism of the legislative body by which any law is passed, to presume in favor of its validity, until its violation is proved *beyond all reasonable doubt.*' " *Rush,* 46 N.W. at 953 (emphasis added; quoting *Ogden v. Saunders,* 25 U.S. (12 Wheat.) 213, 270, 6 L.Ed. 606 (1827) (Washington, J.)). Accordingly, when the issue could reasonably go either way, the directive we read in the Michigan Supreme Court's precedent is to presume constitutionality.

Third, and closely associated with the second point, is that it appears to us that the state legislature has clearly interpreted Article 2, § 4 as not meaning "absolute secrecy" in all instances. We note that Article 2, § 4 is a direct mandate to the state legislature, and that the legislators have all sworn to uphold Michigan's Constitution, *see* MICH. CONST. art. 11, § 1. The respect that the Michigan Supreme Court has declared is due "to the wisdom, the integrity, and the patriotism of the legislative body," *Rush,* 46 N.W. at 953, leads us to presume that the legislature, when enacting the predecessor to MICH. COMP. LAWS. ANN. § 168.751 over 100 years ago and continuing to recodify and amend it throughout this century, *see* MICH. COMP. LAWS. ANN. § 168.751 (Historical Note) (West 1989) (mentioning the numerous previous codifications of the statute's precursors), has believed that the statutory provision satisfies the mandate contained within Article 2, § 4 and its predecessors, and thus that it interprets the phrase "secrecy of the ballot" in Article 2, § 4 as not meaning "absolute secrecy from everyone in all instances." Our understanding of the state legislature's interpretation of Article 2, § 4 is further supported by the legislature's amendment in 1996 of MICH. COMP. LAWS. ANN. § 168.786. That section, at least since 1955, has stated in pertinent part, "The operating of the voting machine by the elector while voting shall be secret and obscure, from all other persons, *except as provided by this act in cases of assisted electors.*" (emphasis added); the 1996 amendment added to the exception for assisted electors a minor child accompanying an elector into the voting booth. Clearly, the legislature does not contemplate the constitutional requirement of secrecy as being absolute.

■ We give great deference to the Michigan legislature's interpretation of Article 2, § 4 for two very important reasons. First, the Michigan Supreme Court itself requires that great deference be given to the legislature's interpretation of state constitutional provisions that confer upon the legislature the affirmative duty to do something. In *Rush,* the court discussed this principle with regard to the 1850 Michigan Constitution's provisions that addressed voting:

> The constitution of Michigan contains three provisions upon the subject [of voting]—sections 1, 2, and 6 of article 7. Section 1 provides who shall be an elector, and that the legislature may provide the way in which his vote shall be cast. Section 2 provides that all votes shall be by ballot. Section 6 provides that laws may be passed to preserve the purity of election, and guard against abuses of the elective franchise. *Under these broad provisions, it has been frequently held to be the exclusive province of the legislature to enact laws providing for the registration of voters, and the time, place, and manner of conducting elections. It may regulate, but cannot destroy, the enjoyment of the elective franchise. Whether such regula-*

tions be reasonable or unreasonable is for the determination of the legislature, and not for the courts, so long as such regulation does not become destruction. Attorney General v. City of Detroit, 78 Mich. 545, 44 N.W. 388. Courts will not declare the law invalid, because its enforcement might result in the restriction of the right to vote, else the registry laws would have been held void. Yet these laws have been universally sustained, on the ground of wise and necessary regulation. In 1832, Chief Justice SHAW sustained them, on the ground that they tended to "promote peace, order, and celerity in the conduct of elections, and as such to facilitate and secure this most precious right to those who were by the constitution entitled to enjoy it." Capen v. Foster, 29 Mass. 485, 12 Pick. 485. The principles then enunciated have been adopted by this court in numerous cases. Twitchell v. Blodgett, 13 Mich. 127; People v. Kopplekom, 16 Mich. 342; Attorney General v. Common Council, 58 Mich. 213, 24 N.W. 887. When power is conferred upon the legislature to provide instrumentalities by which certain objects are to be accomplished, the sole right to choose the means accompanies the power, in the absence of any constitutional provisions prescribing the means. The finding by this court that the law impeded, hampered, or restricted the right to vote, and is therefore void, would be a clear assumption of, and encroachment upon, legislative power,—a substitution of our judgment for that of the legislature. It can only be declared void when it destroys the right. Its unconstitutionality can be determined by no other rule.

Rush, 46 N.W. at 952–53 (emphasis added).

■ Second, as the Michigan Supreme Court has observed, the members of the state legislature "are presumed to have acted within the scope of their authority [when enacting a statute]. We cannot suppose they intentionally spent their time enacting a measure which they knew or had reason to believe would be ineffective and useless because unconstitutional." C.F. Smith Co., 259 N.W. at 355; see also Cruz, 247 N.W.2d at 766 ("[T]he Legislature does not intentionally pass an unconstitutional act."); Evans Prods. Co., 12 N.W.2d at 457 (" '[I]t is to be presumed that the legislature intended to enact a constitutional statute and did not intend to exceed the constitutional limits of its authority.' " (quoting Township of Clarence v. Dickenson, 151 Mich. 270, 115 N.W. 57 (Syllabus) (1908))). The principles of state sovereignty and federalism demand that a federal court accord a state legislature's interpretation of its state constitution a measure of deference when the state supreme court has not clearly spoken on the question. It is the state legislators, and not the federal judiciary, who have sworn to uphold the state constitution and are charged with understanding it, interpreting it, and enacting laws consistent with it.

### III. CONCLUSION

■ For these reasons we conclude that the Appellants are not being denied their state constitutional right to "secrecy of the ballot" as that right has, up to this point, been understood by those charged with interpreting Michigan's constitution. We find no clear indication that the Michigan Supreme Court, if faced with the question, would hold otherwise. We therefore conclude that and Secretary of State of Michigan, by refusing to provide Appellants with voting assistance other than that already extended to them under MICH. COMP. LAWS. ANN. § 168.751, does not discriminate against them in violation of the ADA and/or the RA.[8] Accordingly,

---

8. Dismissal of the Appellants' Rehabilitation Act claim was also appropriate because Appellants did not sufficiently plead the financial assistance jurisdictional prerequisite contained therein. Appellants complaint alleges, "Defendant is an official of the State of Michigan which receives federal financial assistance." J.A. at 13 (Compl.). By the use of the term "which," rather than "who," the sentence clearly alleges that the State of Michigan, rather than the Secretary of State, receives federal financial assistance.

Under the RA, one must allege that he has been excluded from participation in, denied the benefits of, or subjected to discrimination under either "the operations of . . . a department, agency, special purpose district, or other instrumentality of a State . . . any part of which is extended Federal financial assistance," § 794(b)(1)(A), or "in the case of assistance to a State," "the entity of such State . . . that distributes such assistance and each such department or agency (and each

we AFFIRM the judgment of the district court dismissing the complaint.

other State ... entity) to which the assistance is extended," § 794(b)(1)(B). Clearly, general federal assistance to the State, without more, does not bring a claim against the Secretary of State within the authority of § 794(b)(1). *Lightbourn v. County of El Paso, Tex.* 118 F.3d 421, 426–27 (5th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 700, 139 L.Ed.2d 643 (1998). Appellants did not allege that the Secretary of State received federal financial assistance directly from the federal government, that she is the entity of the state who distributes such assistance, or that she has been extended such assistance from the state entity charged with its distribution; therefore, they have failed to state a claim under the RA. Remand to permit Appellants to amend their complaint to plead this jurisdictional prerequisite is not appropriate, since, even if they could plead facts establishing this jurisdictional prerequisite, Appellants cannot prevail on the substance of their claim.