**AMSC SUBSIDIARY CORPORATION,**
Appellant,

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee.**

**Globalstar, L.P., et al., Intervenors.**

**No. 99–1513.**

United States Court of Appeals,
District of Columbia Circuit.

Argued May 17, 2000.

Decided July 11, 2000.

Rehearing and Rehearing En Banc
Denied Sept. 1, 2000.*

---

* Circuit Judge Garland did not participate in this matter.

Bruce D. Jacobs argued the cause for appellant. With him on the briefs were Barry H. Gottfried, Lon C. Levin and Hadrian R. Katz.

Philip L. Malet, William D. Wallace and William F. Adler were on the briefs for intervenors supporting appellant.

Gregory M. Christopher, Counsel, Federal Communications Commission, argued the cause for appellee. With him on the brief were Christopher J. Wright, General Counsel, and Daniel M. Armstrong, Associate General Counsel.

Gregory C. Staple and R. Edward Price were on the brief for intervenors supporting appellee.

Before: GINSBURG, RANDOLPH, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

AMSC Subsidiary Corporation petitions for review of the Federal Communications Commission's decision to license mobile earth terminals (METs) to receive Mobile Satellite Service (MSS) from a foreign-licensed satellite in the Upper L-band of the electromagnetic spectrum. *See In re Applications of SatCom,* Order & Authorization, 14 F.C.C.R. 20,798, 20,798 ¶ 1 (1999). AMSC claims the Commission effectively modified its license to provide MSS in the Upper L-band without affording it the hearing required by § 316 of the Communications Act of 1934. AMSC also claims the Commission's decision was arbitrary and capricious because it abandoned without explanation the agency's long-standing policy against authorizing more than one MSS system to operate in the Upper L-band. In addition, two intervenors claim the Commission could not lawfully allow METs in the United States to use a satellite that is not itself licensed by the Commission to serve the United States. Finding no merit in AMSC's claims, and not reaching that of the intervenors, we deny the petition for review.

## I. Background

MSS is a realtime voice and data telecommunications service provided to and from METs located anywhere within the transmission area of the satellite. MSS can be used on land, including areas too sparsely settled to support cellular or other land-based telecommunications services, at sea, or in the air. In a typical MSS system, a MET transmits to the satellite on one frequency and the satellite simultaneously transmits back to the MET on another frequency. The satellite also communicates with a fixed earth terminal that is connected to the public switched telephone network, thereby allowing direct communications between a MET and an ordinary telephone.

The technical characteristics of MSS create a unique interference problem. A MET uses a nearly omnidirectional antenna to communicate with an MSS satellite, and is incapable of discriminating among transmissions from different MSS satellites; likewise, an MSS satellite transmits indiscriminately to a large geographic area. Therefore, if satellites or METs in two MSS systems covering the same geographic area transmit on the same frequency, then their signals will interfere with one another and one or both signals will not be useful. This can occur even if the two METs are thousands of miles apart. Because of this problem, no two MSS systems can operate on the same frequencies insofar as the footprints of their satellites overlap.

### A. AMSC's License

In 1985 the Commission proposed to license an MSS system to serve the United States in the 28 MHz that comprise the Upper L-band. After receiving comments on its proposal, the Commission estimated that the minimum spectrum needed for a viable MSS system was 20 MHz; considering that estimate, the limited amount of spectrum available, and the high cost of building an MSS system, the Commission decided to license only one system. *See In re Amendment of Parts 2, 22 and 25 of the Commission's Rules,* Second Report & Order, 2 F.C.C.R. 485, 486 ¶ 6 (1987) (*Upper L-band Licensing Order*). The Commission therefore ordered the license applicants to form a consortium for the purpose of developing a single MSS system; in 1989 the Commission licensed that consortium, AMSC, to provide MSS in the United States using the entire Upper L-band. *See In re Amendment of Parts 2, 22 and 25 of the Commission's Rules,* Memorandum Opinion, Order & Authorization, 4 F.C.C.R. 6041, 6058 ¶ 121 (1989) (*AMSC Licensing Order*).

In addition to AMSC's, there are four MSS satellites transmitting to all or parts of North America in the Upper Lband: TMI (licensed by Canada), Telecomm (licensed by Mexico), TMSat (licensed by Russia), and Inmarsat (licensed by the United Kingdom). If AMSC transmitted on all the frequencies in the Upper L-band, its signals would interfere with those of the other MSS operators. Therefore, although it licensed AMSC to use the entire Upper L-band, the Commission expressly conditioned AMSC's use of the license upon the outcome of "international coordination," *id.* at 6048 ¶ 52, that is, the multilateral negotiating process used to avoid interference among carriers licensed by different nations to operate in the same band of spectrum. Thus, in the jargon of the trade, AMSC is authorized to operate only in those portions of the Upper L-band that are "coordinated for" its use. *Order & Authorization,* 14 F.C.C.R. at 20805 ¶ 14.

### B. International Coordination

The Commission, representing the United States in negotiations with the other four affected nations, sought to coordinate 20 MHz of spectrum in the Upper L-band for the exclusive use of AMSC. Because the combined spectrum demands of the five different licensees far exceeded the amount of spectrum available, the five nations were unable to reach a permanent coordination agreement and the Commission was unable to secure 20 of the 28

MHz for AMSC. In 1996, however, the five nations did enter into an interim agreement (known as the Mexico City Memorandum of Understanding (MOU)) under which, pending a permanent coordination agreement, the Upper L-band would be coordinated on a yearly basis by agreement among the five MSS operators themselves. *See Order & Authorization,* 14 F.C.C.R. at 20802 ¶ 18.

Under the Mexico City MOU, the amount of spectrum coordinated for each MSS system can change from year to year. *See id.* The key variables guiding negotiations among the five operators are their (1) present spectrum usage and (2) projected near-term needs. The five operators were able to reach agreements for 1997, 1998, and 1999 but not for 2000. *See id.* at 20814 ¶ 34.

### C. *DISCO II*

As mentioned above, the Commission determined in the *Upper L-band Licensing Order* that it would license only one MSS system in the Upper L-band. The adoption by the United States in 1997 of the WTO Agreement on Basic Telecommunications Services, however, obligated the United States to open its satellite markets to foreign systems licensed by other WTO member countries. *See* Fourth Protocol to the General Agreement on Trade in Services (GATS) (April 30, 1996), 36 I.L.M. 336 (1997) (entered into force Jan. 1, 1998). The Commission therefore adopted procedures to give satellite systems licensed by other countries access to the U.S. market. *See In re Amendment of the Commission's Regulatory Policies to Allow Non–U.S. Licensed Space Stations to Provide Domestic and International Satellite Service in the United States,* Report & Order, 12 F.C.C.R. 24,094 (1997) (*DISCO II*).

In addition to allowing a satellite operator licensed by a foreign country to apply for a U.S. license in the same way that a would-be domestic operator applies for a license to serve customers in the United States, that is, through a "space station processing round," the Commission established a second mechanism by which a foreign system could get access to the U.S. market: Earth stations located in the United States could apply for a license to receive service from a satellite licensed by another country even if that satellite was not itself licensed to serve the United States. *See id.* at 24173–74 ¶ ¶ 183–88. The Commission announced it would grant these earth station licenses if doing so was in the public interest, *see id.* ¶ 186, taking into account "competition in the United States[,] ... spectrum availability, eligibility ... and operating requirements, and national security, law enforcement, foreign policy, and trade issues," *id.* at 24106 ¶ 29.

Concerning spectrum availability—the one factor in the *DISCO II* public interest analysis that is relevant to this case—the Commission acknowledged that the WTO agreement did not require it to authorize a satellite licensed by a foreign country to serve customers in the United States if there was inadequate spectrum: "[The Commission does] not expect to require existing U.S. satellite systems to change their licensed operating parameters or to decrease their capacity in order to accommodate additional non-U.S. systems." *Id.* at 24158 ¶ 147. If the foreign satellite operator sought access to the U.S. market by applying for earth station licenses for U.S. customers to use its satellite, then the Commission indicated that in assessing spectrum availability as part of the public interest analysis it would:

> determine whether, and to what extent, the proposed U.S. service will impact existing operations in the United States.... [In] exceptional cases where grant would create debilitating interference problems or where the only technical solution would require U.S.-licensed systems to significantly alter their operations[,] we would impose technical constraints on the foreign system's operations in the United States or, in cases where any such measures would be insufficient to remedy the technical problem, deny the request.

*Id.* at 24159 ¶ 150. AMSC did not petition for review of *DISCO II.*

### D. The *Order & Authorization*

Shortly after *DISCO II* was released, SatCom Systems, Inc., a U.S. company, and TMI Communications, the company that operates the MSS satellite system licensed by Canada, each applied to the Commission for earth station licenses that would allow up to 125,000 new METs in the United States to use the TMI satellite for MSS in the Upper L-band. *See Order & Authorization,* 14 F.C.C.R. at 20799 ¶ ¶ 2–3. The Commission reviewed the license applications under the public interest analysis announced in *DISCO II.* On the issue of spectrum availability, the Commission concluded that the new METs would have no effect upon AMSC's existing operations. *See id.* at 20810 ¶ 25. Although the METs would be licensed to receive MSS from the TMI satellite throughout the Upper L-band, their licenses would be conditioned upon receiving service only in those portions of the Upper L-band coordinated for the use of the TMI satellite, *see id.* at 20826 ¶ ¶ 63–64, and not on spectrum coordinated for AMSC.

This license condition comes into play, however, only when there is a coordination agreement in effect. *See id.* As AMSC pointed out to the Commission, the existing coordination agreement was set to expire on December 31, 1999—less than two months after the Commission adopted the *Order & Authorization.* If no new coordination agreement was reached, AMSC argued, then the new METs would be free to operate anywhere in the Upper L-band, potentially interfering with AMSC's licensed MSS operations.

The Commission responded to this concern by further conditioning the new earth station licenses upon noninterference with AMSC (and all other MSS operations):

> In the absence of any continuing operator-to-operator agreement in the L-band, SatCom and TMI's operations[,] like those of AMSC ... will be on a noninterference basis until a future operator-to-operator agreement is reached.

*Id.* at 20814 ¶ ¶ 33–34; *see also id.* at 20826 ¶ ¶ 63–64. Finding that the requested earth station licenses satisfied this and the other public interest requirements laid out in *DISCO II,* the Commission granted earth station licenses to SatCom and TMI.

### II. Analysis

·AMSC petitions this court for review of the *Order & Authorization,* raising two challenges: (1) the Commission in effect modified AMSC's license without affording it the hearing required by § 316 of the Communications Act; and (2) the Commission,· without giving a reasoned explanation, reversed its longstanding policy of having only one MSS licensee in the Upper L-band. The Intervenors raise a different claim: The Commission could not allow METs in the United States to use a satellite that is not licensed by the Commission to serve the United States.

### A. Modification of AMSC's License

In § 316 of the Communications Act the Commission is expressly authorized to modify a license as follows:

> Any station license or construction permit may be modified by the Commission ... if in the judgment of the Commission such action will promote the public interest, convenience, and necessity, or the provisions of this chapter or of any treaty ratified by the United States will be more fully complied with.

47 U.S.C. § 316(a)(1). AMSC claims that in the *Order & Authorization* the Commission modified AMSC's license to provide MSS throughout the Upper L-band without providing the hearing required by § 316. The Commission does not dispute that § 316 requires a hearing if the Commission modifies a license, but contends that it did not modify AMSC's license and therefore did not have to hold a hearing.

■ Although the Commission did not, of course, literally change the terms of AMSC's license, we regard "a license [as] modified for purposes of section 316 when an unconditional right conferred by the

license is substantially affected." *P&R Temmer v. FCC,* 743 F.2d 918, 927–28 (D.C.Cir.1984). AMSC claims the Commission substantially affected rights conferred by its license in two respects.

■ First, AMSC argues that the Commission has "harm[ed] AMSC's … prospects" for coordinating sufficient spectrum to meet its needs in future rounds of international negotiations. By licensing METs in the United States to use the TMI satellite, the Commission increased TMI's present and future needs in the Upper L-band, thereby reducing AMSC's need as a proportion of aggregate international demand for that spectrum. Because the crucial variables affecting coordination under the Mexico City MOU are present spectrum usage and projections of short-term future spectrum need, AMSC claims the Commission "dramatically improve[d] TMI's negotiating position and correspondingly weaken[ed] AMSC's negotiating position," thus ensuring that AMSC will be unable to obtain through the international coordination process the 20 MHz it says it needs.

The Commission responds that AMSC's license has always been expressly conditioned upon the international coordination process. AMSC's license does not guarantee success in those negotiations; it merely provides the opportunity to participate, which is unaffected by the *Order & Authorization.*

We agree with the Commission. We assume for the sake of the argument that AMSC is correct in predicting that TMI will obtain more L-band spectrum at AMSC's expense in future rounds of international coordination. That does not work a modification of AMSC's license because the license contains no "unconditional right" to any particular outcome in the coordination process. *P&R Temmer,* 743 F.2d at 927. On the contrary, the license is expressly conditioned upon and thereby made subordinate to the outcome of international coordination. We further note that AMSC is not required to accept any future coordination agreement; it can simply veto an agreement it believes offers it

an unduly limited amount of spectrum, whether as a result of TMI's greater traffic in the United States or for any other reason.

Second, AMSC claims the Commission modified its license by subjecting it to an increased risk of electrical interference. *See FCC v. National Broadcasting Co. (KOA),* 319 U.S. 239, 245, 63 S.Ct. 1035, 87 L.Ed. 1374 (1943); *Western Broadcasting Co. v. FCC,* 674 F.2d 44, 50 (D.C.Cir.1982). The Commission acknowledged in the *Order & Authorization* that the AMSC and TMI satellites cover the same geographic area and so would cause mutually destructive interference to the extent they operate on the same frequencies. 14 F.C.C.R. at 20815 ¶ 36. Therefore, AMSC argues, the Commission's licensing of new METs to use the TMI satellite increases the likelihood that AMSC will face interference in conducting its operations.

Because the new METs are limited to the spectrum coordinated for use by TMI, however, the Commission denies that the *Order & Authorization* increases the likelihood that AMSC will face interference. The Commission's point is plainly well-taken when an international coordination agreement is in effect: With each system licensed to use only the Upper L-band frequencies that have been coordinated for its use, AMSC and TMI will not interfere with each other.

AMSC claims, however, that when there is no coordination agreement in effect SatCom and TMI are free to operate on any frequency in the Upper L-band, including the frequencies that had previously been coordinated for AMSC. The Commission responds that even then the likelihood of interference is not increased by the *Order & Authorization* because SatCom's and TMI's licenses are expressly conditioned upon their operating "on a non-interference basis." *Id.* at 20826 ¶ ¶ 63–64. If they violate that express condition, then the Commission may revoke their licenses. *See* 47 U.S.C. § 312. (We note, without surprise, that AMSC does not claim to

have experienced any interference since December 31, 1999, when the last coordination agreement expired.)

In sum, we agree with the Commission that in these circumstances AMSC's claim of an increased likelihood of interference is too speculative to constitute a modification of its license cognizable under § 316. Therefore, no hearing was required.

## B.   Reasoned Decision Making

■   AMSC claims the Commission failed adequately to explain in the *Order & Authorization* the reversal of its long-held position that the amount of spectrum needed for a viable MSS system precludes the Commission from licensing more than one such system in the Upper L-band. AMSC is correct that the Commission's policy had been to authorize only one MSS system in the Upper L-band; AMSC's claim fails, however, because the Commission reversed that policy in *DISCO II*, and replaced it with a public interest condition that the Commission then applied—with an adequate explanation—in the *Order & Authorization* here under review.

The Commission points out in the *Order & Authorization* that it had established rules in *DISCO II* for licensing earth stations to receive service from a satellite licensed by another country if such service would be in the public interest. 14 F.C.C.R. at 20804 ¶ 11. AMSC had expressed its concern in *DISCO II* that there was inadequate spectrum in the Upper L-band to allow a non-U.S. satellite to serve MSS customers in the United States. *See Reply Comments of AMSC Subsidiary Corp.*, IB Docket No. 96–111 (Sept. 5 1997). Although it was aware of AMSC's concern, the Commission did not treat the satellite market in the Upper L-band differently than any other U.S. satellite market. By its terms, therefore, the public interest analysis in *DISCO II* appears to govern entry by foreign-licensed satellites into the Upper L-band MSS market in the United States.

AMSC argues, however, that the public interest analysis in *DISCO II* did not alter the Commission's existing spectrum management policy for the Upper L-band; to the contrary, AMSC claims *DISCO II* incorporated that policy as one requirement that a non-U.S. licensed satellite must satisfy in order to use the Upper L-band to serve customers in the United States. In other words, AMSC reads *DISCO II* as merely contingent: If at some future point AMSC were to obtain 20 MHz of spectrum (or if the Commission were to give a reasoned explanation why AMSC should make do with less than 20 Mhz) then the Commission could authorize a foreign MSS to serve the United States in the Upper L-band pursuant to the *DISCO II* procedures. Because AMSC has less than 20 MHz of spectrum, however, and the Commission has not explained why AMSC has enough spectrum to be viable—indeed, it expressly reserved the issue how much spectrum is required for an MSS to be viable, *see Order & Authorization*, 14 F.C.C.R. at 20813 ¶ 31 & n. 85—AMSC claims the Commission failed to provide a reasoned explanation for allowing a second MSS system to serve the United States in the Upper L-band.

The Commission denies that the public interest analysis in *DISCO II* carried forward the Commission's prior spectrum management policy for the Upper L-band. The policy prior to *DISCO II* had been concerned with AMSC's eventual spectrum needs; the Commission's goal had been to secure for AMSC use of at least 20 MHz in the Upper L-band. The factor of spectrum availability in the public interest analysis of *DISCO II*, however, protects only AMSC's existing operations. *See DISCO II*, 12 F.C.C.R. at 24158–59 ¶ ¶ 147, 150 (Commission "d[oes] not expect to require existing U.S. satellite systems to change their licensed operating parameters or to decrease their capacity in order to accommodate additional non-U.S. systems," and Commission will condition or decline license applications "where grant would create debilitating interference problems or where the only technical solution would require U.S.-licensed sys-

tems to significantly alter their operations").

■ We agree with the Commission that in the *DISCO II* rulemaking proceeding it changed the spectrum management policy for the Upper L-band; we think the matter is clear but, even were it opaque, we would accept the Commission's reasonable interpretation of its own rules. *See Cassell v. FCC*, 154 F.3d 478, 484 (D.C.Cir. 1998). The only open question, therefore, is whether the Commission applied *DISCO II* in an arbitrary and capricious manner in the present case. The Commission explained at length in the *Order & Authorization* why SatCom's and TMI's licenses satisfy the tests for spectrum availability announced in *DISCO II*: The new METs will not require AMSC to change its licensed operating parameters, *see* 14 F.C.C.R. at 20810 ¶ 25, nor to decrease its system capacity, *see id.* at 20811 ¶ 26; neither will they cause interference problems for AMSC, *see id.* ¶¶ 27, 33–34. Because the Commission thus gave a thorough and reasoned explanation of its decision, we deny AMSC's petition for review.**

### C. The Intervenors' Claim

■ Intervenors Globalstar L.P. and Space System License, Inc. claim the Commission cannot license METs in the United States to use the TMI satellite without that satellite having first been licensed to operate in the United States—a requirement that would have obliged the Commission to conduct a space station processing round in which the intervenors could also have competed for a license. The Commission urges us not to consider the intervenors' claim because the petitioner did not raise it and there are no exceptional circumstances warranting its consideration at the instance of an intervenor. The intervenors reply that they do not raise an issue different from that raised by AMSC;

rather, as required by D.C.Cir. Rule 28(e), they merely "focus upon points not made or adequately elaborated upon in [AMSC's] brief, although relevant to the issues" raised by AMSC. Specifically, the common issue as they state it is "whether the FCC unlawfully granted [the TMI satellite] access to MSS spectrum in the United States that was not otherwise available for licensing except to AMSC."

Recall that AMSC claimed the Commission was required to explain why AMSC could make do with less than 20 MHz before it allowed another satellite to serve customers in the United States using the Upper L-band; it did not deny that with such an explanation the Commission could allow the second satellite to provide such service using the licensing procedure for earth stations it announced in *DISCO II*. Ratcheting down the intervenors' issue to a comparable level of abstraction, one can see that the intervenors are indeed trying to raise a different issue than does the petitioner. The intervenors argue that even if the Commission fully explained why there is sufficient spectrum in the Upper L-band for two MSS systems to serve U.S. customers, it still could not allow TMI to serve customers in the United States without conducting a space station processing round.

We have repeatedly held that only in "extraordinary cases," *Lamprecht v. FCC*, 958 F.2d 382, 389 (D.C.Cir.1992), will we address an issue raised solely by an intervenor. We have identified two factors, at least one (and perhaps both) of which must be present to establish such circumstances: The intervenor had no incentive to file its own petition for review; and resolution of the issue raised by the intervenor is an "essential predicate" to the resolution of the issue raised by the petitioner. *Synovus Fin. Corp. v. Board of Governors of*

---

** AMSC claims in its reply brief that the Commission failed to address AMSC's objection to SatCom's and TMI's failure to provide certain technical information required by Commission regulations. Although AMSC alluded to the factual basis for this claim in the statement of facts in its opening brief, it did not actually make the argument until its reply brief. The argument is therefore waived. *See Sitka Sound Seafoods, Inc. v. NLRB*, 206 F.3d 1175, 1181 (D.C.Cir.2000).

*the Fed. Reserve Sys.,* 952 F.2d 426, 433 (D.C.Cir.1991); *see also National Ass'n of Regulatory Utility Comm'rs v. ICC,* 41 F.3d 721, 730 (D.C.Cir.1994).

Neither factor is present in this case. The intervenors were aggrieved by the Commission having authorized the TMI satellite to provide service to METs in the United States without opening up a space station round; therefore, they had the incentive and the ability to file their own petition for review. And resolution of the intervenors' issue is neither a necessary nor even a logical antecedent to the resolution of the petitioners' issue; if anything, the opposite is true. We therefore do not consider the intervenors' challenge.

### III. Conclusion

For the foregoing reasons, AMSC's petition for review is

*Denied.*