# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 19, 2007        Decided May 20, 2008

No. 07-5063

THE AMERICAN COUNCIL OF THE BLIND, ET AL.,
APPELLEES

v.

HENRY M. PAULSON, JR., SECRETARY OF THE TREASURY,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 02ms00864)

———

*Jonathan F. Cohn*, Deputy Assistant Attorney General, U.S. Department of Justice, argued the cause for appellant. With him on the briefs were *Peter D. Keisler*, Assistant Attorney General, *Jeffrey A. Taylor*, U.S. Attorney, and *Mark B. Stern*, *Marleigh D. Dover*, and *Charles W. Scarborough*, Attorneys. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

*Scott C. LaBarre* argued the cause for *amicus curiae* National Federation of the Blind in support of appellant. With him on the brief was *Joseph B. Espo*.

*Jonathan T. Howe* and *C. Michael Deese* were on the brief for *amicus curiae* National Automatic Merchandising

Association.

*Jeffrey A. Lovitky* argued the cause and filed the brief for appellee.

*Harold Hongju Koh* and *David N. Rosen* were on the brief for *amici curiae* Perkins School for the Blind, et al. in support of appellee.

Before: RANDOLPH, ROGERS and GRIFFITH, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

Dissenting opinion by *Circuit Judge* RANDOLPH.

ROGERS, *Circuit Judge*: The Secretary of the Treasury appeals the declaratory judgment that the Treasury Department's failure to design and issue paper currency that is readily distinguishable to the visually impaired violates section 504 of the Rehabilitation Act, 29 U.S.C. § 794. The Secretary contends that various coping mechanisms that enable the visually impaired to use U.S. currency, as well as the availability of portable currency readers to identify denominations and credit cards as an alternative to cash, demonstrate that there is no denial of meaningful access to currency. Consequently, the Secretary maintains that the district court erred in finding to the contrary and should not have reached the question of whether identified accommodations would impose an undue burden. Alternatively, assuming a denial of meaningful access, the Secretary contends that the district court erred in validating identified accommodations in view of their added costs and the burden on the public.

Congress expressly intended the Rehabilitation Act to ensure that members of the disabled community could live

independently and fully participate in society. 29 U.S.C. § 701(b)(1). The Secretary acknowledges that a paper currency system designed for the sighted means that millions of visually impaired individuals are dependent on the kindness of others, unless they purchase expensive electronic equipment, in using U.S. currency. Such dependence, which is amply supported by the record, constitutes a denial of meaningful access to U.S. currency that is not remedied by use of existing coping mechanisms. The record further demonstrates that the Secretary has not met his burden to show, as an affirmative defense, that each identified accommodation that is facially reasonable, effective, and feasible would impose an undue burden. A large majority of other currency systems have accommodated the visually impaired, and the Secretary does not explain why U.S. currency should be any different. The financial costs identified by the Secretary are not out of line with the costs associated with other currency changes that the Secretary has made and could be reduced were accommodations made as part of other planned changes. Further, this lawsuit seeks neither alteration of the system of using paper currency as such nor a specific accommodation dictated by court order, leaving the Secretary to choose the means of bringing U.S. currency into compliance with section 504. Accordingly, we affirm the grant of partial summary judgment and remand the case for the district court to address the request for injunctive relief.

## I.

Section 504 of the Rehabilitation Act provides that:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal

financial assistance or under any program or activity conducted by any Executive agency . . . .

29 U.S.C. § 794. This provision was originally proposed as an amendment to Title VI of the Civil Rights Act of 1964[1] and was designed to extend civil rights to disabled individuals and provide them a full opportunity to participate in American society. One of the primary purposes of the Rehabilitation Act is "to empower individuals with disabilities to maximize employment, economic self-sufficiency, independence, and inclusion and integration into society, through – . . . (F) the guarantee of equal opportunity." 29 U.S.C. § 701(b)(1). Congress expressly found that:

[D]isability is a natural part of the human experience and in no way diminishes the right of individuals to –

(A) live independently;

(B) enjoy self-determination;

(C) make choices;

(D) contribute to society;

(E) pursue meaningful careers; and

(F) enjoy full inclusion and integration in the economic, political, social, cultural, and educational mainstream of American society.

---

[1] *See* S. 3044, 92d Cong., 118 Cong. Rec. 525-26 (1972); H.R. 14,033, 92d Cong., 118 Cong. Rec. 9712 (1972); H.R. 12,154, 92d Cong., 117 Cong. Rec. 45,945 (1971); *see also Alexander v. Choate*, 469 U.S. 287, 295 n.13 (1985).

29 U.S.C. § 701(a)(3).

The Supreme Court has instructed that section 504 does not require proof of discriminatory intent because "[d]iscrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference – of benign neglect." *Choate*, 469 U.S. at 295; *see also Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 412-13 (1979). Further, the Court has acknowledged that where a public entity refuses to accommodate otherwise qualified disabled individuals, its refusal may be "unreasonable and discriminatory." *Choate*, 469 U.S. at 300 (quoting *Davis*, 442 U.S. at 413).[2] However, "[a]ny interpretation of § 504

---

[2] Other circuits have construed section 504 broadly to accomplish its stated purposes, guided by the principle that the Rehabilitation Act is designed to "promote, among other things, the inclusion and integration of persons with disabilities into mainstream society," *J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 70 (2d Cir. 2000), and as a remedial statute should be "'construed broadly to effectuate its purposes,'" *Henrietta D. v. Bloomberg*, 331 F.3d 261, 279 (2d Cir. 2003) (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)). Further, the courts have tended to construe section 504 *in pari materia* with Title II of the ADA, 42 U.S.C. § 12,132, reasoning that these statutory provisions are "'similar in substance' . . . [and consequently] 'cases interpreting either are applicable and interchangeable.'" *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999) (quoting *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998); *see Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 908 (6th Cir. 2004); *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 845 n.6 (7th Cir. 1999). Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12,132.

must . . . be responsive to two powerful but countervailing considerations – the need to give effect to the statutory objectives and the desire to keep § 504 within manageable bounds." *Id.* at 299.

In 2002, the American Council of the Blind and two individuals with visual impairments, Patrick Sheehan and Otis Stephens (collectively "the Council"), filed suit, alleging that the physical design of U.S. paper currency violates section 504. The complaint alleged that "[t]he ability to use [U.S.] banknotes in a fast and easy manner is an essential ingredient of independent living," and yet "for millions of Americans with blindness or low vision, it is impossible to recognize the denomination of banknotes." Compl. at Introduction. Identifying a variety of accommodations relating to color, size, and shape of paper currency as well as the addition of a durable tactile feature, such as embossed dots, foil, micro-perf, and raised intaglio printing, the Council sought declaratory and injunctive relief to prohibit the Secretary from continuing to manufacture banknotes greater than the $1 bill in their present format and to require the Secretary to create and implement a corrective action plan, including development of an inexpensive portable electronic device capable of accurate and rapid denomination of banknotes.[3]

Sheehan and Stephens submitted declarations providing substance to the alleged obstacles faced by the visually impaired in using paper currency that coping mechanisms cannot

---

[3] The Council disclaimed any effort to seek changes to the $1 bill in moving for summary judgment. *See* Pls.' Motion for Summary Judgment Text of Proposed Order, Dist. Ct. Docket 35-1, at 2 (Aug. 31, 2005); *see also, e.g.*, Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, sec.6, div. D, tit. I, § 113, 121 Stat. 1844, 1978 (2007).

overcome. Each is highly educated and accomplished; Sheehan holds Bachelor of Arts and of Science degrees and currently works at the U.S. Department of Veterans Affairs, and Stephens has a PhD and is a professor at the University of Tennessee College of Law. Stephens has no vision while Sheehan has limited vision in one eye. Both men have developed coping mechanisms to address their disability; for example, seeking the assistance of sighted individuals or using closed circuit television to magnify bills to discern their denominations and folding bills in a manner to mark their denominations. Despite these coping mechanisms, they continue to experience obstacles in using paper currency, including instances when they were defrauded because they could not denominate bills and other instances when someone alerted them to their proffer of an incorrect denomination. Stephens observes that "[b]y being dependent on a sighted person, I can never be certain whether I have provided or received the correct denominations." Decl. of Otis Stephens ¶ 13 (Aug. 2, 2005), Dist. Ct. Docket 35-37. He explains, "I cannot emphasize enough the feelings of insecurity and vulnerability which I experience whenever I engage in currency transactions due to my inability to distinguish between denominations." *Id.* The Council also proffered evidence that the obstacles presented by the current physical design of U.S. paper currency transcend personal financial transactions and inhibit the ability of the visually impaired to secure entry-level employment that requires the handling of paper currency. Decl. of OurMoneyToo.org at 3 (Apr. 8, 2005), Dist. Ct. Docket 35-15.

In 1995, the National Research Council of the National Academy of Sciences found that over 3.7 million Americans are visually impaired, more than 200,000 of whom have no vision at all. *See* COMM. ON CURRENCY FEATURES USABLE BY THE VISUALLY IMPAIRED, NAT'L RESEARCH COUNCIL, CURRENCY FEATURES FOR VISUALLY IMPAIRED PEOPLE 1 (Nat'l Acad. of

Sciences 1995) ("1995 NRC REPORT"). Age-related diseases constitute the leading causes of visual impairment in the United States so that as the population ages, the number of individuals with visual impairments will increase. *Id.* at 14. More than twenty-five percent (25%) of individuals over eighty-five years of age are visually impaired. *Id.* The Report further found that:

> An important aspect of a person's full participation in today's society is being able to conveniently and confidentially exchange currency in everyday transactions, as when using public transportation or making purchases. U.S. citizens with low vision experience a uniquely difficult task in that U.S. banknotes are remarkably uniform in size, color, and general design. The banknotes provide no basis for denominating by blind persons.

*Id.* at 1 (citations omitted).[4]

Of the 171 authorities issuing currency identified by the 1995 NRC Report, only the United States prints bills that are identical in size and color in all denominations.[5] *Id.* at 106-12.

---

[4] The 1995 NRC Report recommended four possible design modifications of U.S. currency: (1) variation in length and height of each denomination; (2) large high-contrast numerals greater than half the height of a bill against a uniform background; (3) different predominant colors for each denomination; and (4) inclusion of features to assist with development of low-cost currency readers. 1995 NRC REPORT at 67-76. Further study was recommended, including of tactile features. *Id.* at 76.

[5] After the 1995 NRC Report, U.S. paper currency was modified to incorporate subtle differences in background color in different denominations. Supplemental Decl. of Thomas A. Ferguson, Director of the Bureau of Engraving and Printing ¶ 6 (Aug. 30, 2005),

Of the issuing authorities, 128 use paper currency that varies in size between some denominations, 24 use large numerals, 167 use different color schemes for each denomination, and 23 incorporate tactile features. *Id.* at 101-04. In total, more than seventy-eight percent (78%) of authorities surveyed issued paper currency in which at least some denominations could be identified by those with no vision, either by means of tactile features or size variations.[6] Since 1995, Canada has redesigned its currency to include embossed dots that vary by denomination, and the Euro, introduced in 2002, has incorporated a foil feature perceptible to touch.

The Secretary has acknowledged that the physical design of U.S. paper currency means that individuals with extremely low vision or no vision are unable to identify denominations with their own senses. Def.'s Resp. to Pls.' Statement of Material Facts Not in Dispute ¶ 2, S.J.A. 711. Over the past three decades, a number of studies addressing access for the visually impaired have been conducted by the Bureau of Engraving and Printing, to which the Secretary has delegated his

Dist. Ct. Docket 33-6 ("Ferguson Supplemental Decl."). However, the Secretary concedes that the various denominations remain "virtually identical in color." Pls.' Statement of Material Facts Not in Dispute ¶ 1 (Aug. 31, 2005), Supplemental Joint Appendix ("S.J.A.") 683; Def.'s Resp. to Pls.' Statement of Material Facts Not in Dispute ¶ 1 (Oct. 26, 2005), S.J.A. 711.

[6] Over sixty-five percent (65%) of authorities issued currency in which every denomination either varied by size or included a tactile feature. In addition, 20 varied the size of paper currency in some denominations; 1 incorporated tactile features in some denominations; and 1 varied size and incorporated tactile features in some denominations. 1995 NRC REPORT at 106-12.

responsibilities for the currency under 12 U.S.C. § 418,[7] Treasury Order 101-07, 61 Fed. Reg. 48,727 (Sept. 16, 1996). The Bureau commissioned the 1995 NRC Report, 1995 NRC REPORT at ix-x, and has itself investigated means of making currency accessible to the visually impaired, *see, e.g.*, BUREAU OF ENGRAVING & PRINTING, A STUDY OF MECHANISMS FOR THE DENOMINATION OF U.S. CURRENCY BY THE BLIND OR VISUALLY IMPAIRED 1 (final draft, Aug. 24, 1983), Dist. Ct. Docket 35-3 ("1983 BEP STUDY").[8] In 2001, the Bureau examined the

---

[7] Section 418 provides:

> In order to furnish suitable notes for circulation as Federal reserve notes, the Secretary of the Treasury shall cause plates and dies to be engraved in the best manner to guard against counterfeits and fraudulent alterations, and shall have printed therefrom and numbered such quantities of such notes of the denominations of $1, $2, $5, $10, $20, $50, $100, $500, $1,000, $5,000, $10,000 as may be required to supply the Federal Reserve banks. Such notes shall be in form and tenor as directed by the Secretary of the Treasury under the provisions of this chapter and shall bear the distinctive numbers of the several Federal reserve banks through which they are issued.

12 U.S.C. § 418.

[8] The 1983 BEP Study addressed the utility of modifying the visual and physical design of paper currency to assist individuals with low or no vision and evaluated features incorporated into fifty-four foreign currencies. 1983 BEP STUDY at 3-4. The study concluded that the most useful design features would be different sized currency for various denominations, but because of the cost such a design change could have on the public at large and private sector commercial interests, it recommended the development of handheld electronic currency readers. *Id.* at 16-17.

possibility of adding an embossed feature to paper currency.[9] In 2004, the Bureau requested proposals for low-cost portable currency readers. In this litigation the Secretary has identified as currently available a portable reader that takes only a few seconds to determine the value of a bill after it is inserted; however, it costs $270 and has difficulty identifying $20 bills. The Bureau also undertook major redesigns of paper currency in 1996 and 2004 to protect against counterfeiting. Ferguson Supplemental Decl. ¶¶ 3-7. Although some modifications implemented during these redesigns may have rendered ancillary benefits, the Secretary has not suggested that these modifications have enabled the visually impaired to independently identify the denomination of paper currency without purchasing an expensive portable reader. Def.'s Resp. to Pls.' Statement of Material Facts Not in Dispute, S.J.A. 711.

With respect to the possible accommodations described in the amended complaint, all of which are currently used in some other countries and have been recommended by the several studies conducted by or on behalf of the Bureau, the Director of the Bureau provided estimates of the costs of implementation. Including a numeral on each denomination at least sixty percent (60%) of current note height would cost approximately $4.5 million and increase the annual cost of currency production by up to $400,000. Ferguson Supplemental Decl. ¶ 11. Addition

---

[9] The Bureau requested that the Canadian Bank Note Company, which developed the embossed feature recently incorporated into Canadian paper currency, apply its methodology to ten U.S. bank notes and test them for durability. Decl. of H. Hutchinson Holton ¶¶ 3-4, 8 (Aug. 25, 2005), Dist. Ct. Docket 35-44. The Company concluded that although the embossed feature retained a "satisfactory" height, a larger, scientifically sound sample was required to determine accurately the effect of its embossing technique on U.S. currency. *Id.* at ¶¶ 8-10; *see also* CANADIAN BANK NOTE CO., TACTILE FEATURE FOR THE BLIND (2001), Dist. Ct. Docket 35-19.

of a durable tactile feature would cost between $45 million and $75 million and increase the annual cost of currency production by between $9 million and $18 million. *Id.* ¶¶ 9-10. Adopting different sizes for each denomination could cost in excess of $200 million. Def.'s Response to Pls.' Second Request for Production of Documents at 12 (Aug. 27, 2004), Dist. Ct. Docket 43-2.[10] All of these cost estimates, however, include making changes to the $1 bill, as to which no change is sought and which according to the Bureau accounts for roughly half of all currency printed each year. Decl. of Thomas A. Ferguson, Director of the Bureau of Engraving and Printing, in response to Pls.' Motion for Summary Judgment ¶¶ 11-13 (Oct. 25, 2005), Dist. Ct. Docket 43-1 ("Ferguson S.J. Decl.").

The district court, in response to the parties' cross-motions for summary judgment,[11] granted the Council's motion in part and denied the Secretary's motion. *Am. Council of the Blind v. Paulson*, 463 F. Supp. 2d 51 (D.D.C. 2006). Although rejecting the claim that the visually impaired have "no access" to paper

---

[10] The Bureau's estimates far exceed those in its 1983 study, even accounting for inflation, which roughly halved the purchasing power of the dollar between 1983 and 2005, Bureau of Labor Statistics, Department of Labor, CPI Inflations Calculator, http://www.bls.gov/data/home.htm. In 1983, the Bureau estimated that producing paper currency in different sizes would cost $26 million initially and increase annual production costs by $7 million, and that incorporation of a durable, tactile feature would cost $8.1 million initially and $3.05 million annually. 1983 BEP STUDY 4, 14.

[11] The district court denied the Secretary's initial motion for summary judgment, and denied in part a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6); the district court dismissed the United States Treasurer, who has no authority over the design of currency, as a co-defendant. *Am. Council of the Blind v. Snow*, 311 F. Supp. 2d 86, 90 (D.D.C. 2004).

currency, *id.* at 59, the district court concluded that the Council had met its burden to show that the visually impaired are denied meaningful access.  In response to the Secretary's argument that existing coping mechanisms sufficed, the district court found that while "[t]here was a time when disabled people had no choice but to ask for help – to rely on the kindness of strangers[,] . . . [i]t can no longer be successfully argued that a blind person has meaningful access to currency if she cannot accurately identify paper money without assistance." *Id.* (internal quotation marks omitted).  The district court also found that the Council had identified "several potential accommodations that are reasonable on their face." *Id*. at 62. The district court further concluded that the Secretary had failed to meet his burden to demonstrate that providing any accommodation to the visually impaired would impose an undue burden. *Id.* at 60.  The district court noted that the Secretary had "tacitly conceded at least the feasibility of each proposed feature, except raised intaglio printing, by providing cost estimates." *Id.* at 61.  Finding further that the estimated costs, which are "the heart of the government's undue burden argument," *id.* at 62, "would represent only a small fraction of [the Bureau's] annual expenditures," the district court observed that the costs could be "even smaller" were adjustments for the visually impaired incorporated in a larger redesign, *id*. Accordingly, the district court entered a declaratory judgment that the Secretary's "failure to design, produce and issue paper currency that is readily distinguishable to blind and visually impaired individuals violates § 504 of the Rehabilitation Act," and ordered further proceedings on injunctive relief.  *Id*. at 63. In so doing, the district court stated that it "has neither the expertise, nor, I believe, the power, to choose among the feasible alternatives, approve any specific design change, or otherwise to dictate to the Secretary of the Treasury how he can come into compliance with the law." *Id.* at 62.

The Secretary appeals, and we exercise our discretion to entertain this interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The district court certified that its order "involves a controlling question of law as to which there is substantial ground for difference of opinion, and an immediate appeal from this order may materially advance the ultimate termination of the litigation." *Id.* at 62-63. The Secretary has met his burden of showing that "exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of final judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 474 (1978) (internal quotation marks omitted). The Secretary explains that the district court has ruled on all issues of section 504 liability and future proceedings in the district court are aimed at determining only what injunctive relief is appropriate. Were we to conclude that the Secretary should have prevailed on summary judgment, our consideration of this matter would eliminate the need for further proceedings and preserve judicial resources. On the other hand, were we to conclude that the district court properly granted partial summary judgment for the Council, our consideration of this matter would eliminate uncertainty about liability before the Secretary invests resources in determining how best to come into compliance with section 504.

The Council's objection that because the district court has not yet ordered a specific remedy the Secretary's contentions regarding the issue of undue burden are hypothetical, and that we should therefore decline to reach the undue burden issue, is not well taken. The court cannot address the Secretary's liability under section 504 without considering whether he has demonstrated that implementing all accommodations would be unduly burdensome. *See Am. Pub. Transit Ass'n v. Lewis*, 655 F.2d 1272, 1278 (D.C. Cir. 1981) (quoting *Davis*, 442 U.S. at 412); *see also Robertson v. Las Animas County Sheriff's Dep't*, 500 F.3d 1185, 1196 (10th Cir. 2007); *Ams. Disabled for*

*Accessible Pub. Transp. v. Skinner*, 881 F.2d 1184, 1192 (3d Cir. 1989) (en banc). Consideration of this question is not hypothetical; at the summary judgment stage of the proceedings, the Secretary, as the non-moving party, had to proffer sufficient evidence to create a material issue of disputed fact with regard to all accommodations found facially reasonable, effective, and feasible by the district court. *See Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). The court can properly consider whether the Secretary has met this burden.

Our dissenting colleague would deny the Secretary's request for an interlocutory appeal based on a perception that the record contains insufficient information about the effectiveness and feasibility of various accommodations. *See* Dissenting Op. at 1-2. However, the Secretary contends only that the identified accommodations are too costly, conceding that various tactile features are both effective and feasible based on the implementation of such accommodations in other countries. *See infra* pp. 31-32. Consequently, our dissenting colleague's invocation of legal arguments that have no basis in the history of this lawsuit cannot refute the conclusion that the Secretary's argument in support of an interlocutory appeal is well taken. Because the Secretary does not challenge the propriety of the district court's allocation of burdens, the issue of whether the Secretary has demonstrated a sufficient burden with respect to the accommodations found by the district court to be reasonable "on the face of things," *Am. Council of the Blind*, 463 F. Supp. 2d at 60, is presented in sharp relief.

## II.

To prove a violation of section 504, the plaintiffs must show that (1) they are disabled within the meaning of the Rehabilitation Act, (2) they are otherwise qualified, (3) they were excluded from, denied the benefit of, or subject to

discrimination under a program or activity, and (4) the program or activity is carried out by a federal executive agency or with federal funds. The defendant may assert as an affirmative defense to liability that accommodating the plaintiffs' disabilities would constitute an undue burden.[12] Our review of the partial grant of summary judgment is *de novo*. *See Tao*, 27 F.3d at 638.

The Secretary does not contest three self-evident elements of liability under section 504. First, the visually impaired are disabled within the meaning of the statute. Second, the visually impaired are qualified to engage in commerce using U.S. currency. Third, the production and design of currency is a "program or activity" carried out by an Executive agency within the meaning of section 504.[13] In addressing the remaining

---

[12] *See Davis*, 442 U.S. at 412; *Barth v. Gelb*, 2 F.3d 1180, 1182 (D.C. Cir. 1993); *Crawford v. Ind. Dep't of Corr.*, 115 F.3d 481, 483 (7th Cir. 1997), *abrogated on other grounds by Erickson v. Bd. of Governors of State Colls. & Univs. for Ne. Ill. Univ.*, 207 F.3d 945, 948 (7th Cir. 2000).

[13] The Secretary's failure to challenge the applicability of section 504 is understandable given the expansive meaning of the words "any program or activity." *See United States v. Gonzales*, 520 U.S. 1, 5 (1997); *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002); *Johnson v. City of Saline*, 151 F.3d 564, 570 (6th Cir. 1998); *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 45 (2d Cir. 1997), *superseded on other grounds*, *Zevos v. Verizon New York, Inc.*, 252 F.3d 163, 171 n.7 (2d Cir. 2001). Further, the federal agencies interpreting section 504, including the Treasury Department, have concluded that "a federally conducted program or activity is, in simple terms, anything a Federal agency does." DEP'T OF THE TREASURY, ENFORCEMENT OF NONDISCRIMINATION ON THE BASIS OF HANDICAP IN TREASURY PROGRAMS, 56 Fed. Reg. 40,781, 40,782 (Aug. 16, 1991); *see also, e.g.*, DEP'T OF THE INTERIOR,

issues, we note that, as the Secretary proposed, the district court applied the burden shifting approach in *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401-02 (2002), requiring the Council to demonstrate that "a requested accommodation would be 'reasonable on its face,'" and then shifting the burden to the Secretary to demonstrate ultimately that an accommodation would constitute an undue burden. *Am. Council of the Blind*, 463 F. Supp. 2d at 59 (quoting *U.S. Airways*, 535 U.S. at 402). Although the Supreme Court's discussion is instructive, *U.S. Airways* does not strictly govern claims under section 504. That case involved balancing reasonable accommodations in employment against the hardship imposed on employers under Title I of the ADA, which contains terms that do not appear in section 504. *Id.* at 400-02.[14] However, we need not decide whether the plaintiffs' burden includes demonstrating that a proposed accommodation is facially reasonable. The Council could surmount this hurdle because it identifies accommodations that other countries use in practice, that the National Research Council has recommended for consideration, and that the

---

ENFORCEMENT OF NONDISCRIMINATION ON THE BASIS OF HANDICAP IN FEDERALLY CONDUCTED PROGRAMS, 58 Fed. Reg. 57,690, 57,691 (Oct. 26, 1993); CENT. INTELLIGENCE AGENCY, ENFORCEMENT OF NONDISCRIMINATION ON THE BASIS OF HANDICAP IN PROGRAMS OR ACTIVITIES CONDUCTED BY THE CENTRAL INTELLIGENCE AGENCY, 57 Fed. Reg. 39,604, 39,605 (Sept. 1, 1992).

[14] Title I of the ADA requires "making *reasonable accommodations* to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [a] covered entity can demonstrate that the accommodation would impose an *undue hardship* on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). Neither of the italicized terms appears in section 504 although the Supreme Court has used similar terms in discussing section 504, *see, e.g.*, *Davis*, 442 U.S. at 412.

Secretary has not suggested are infeasible and the costs of some, by the Secretary's own estimates, are of similar magnitude to the costs of recent paper currency redesigns. As millions of individuals with visual impairment face daily obstacles in using U.S. paper currency, requiring the Secretary to adopt an accommodation would not be disproportionate to the benefit. *Cf. Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 542 (7th Cir. 1995).

**A.**

The Secretary does not dispute that the visually impaired cannot determine the denominations of paper currency without either the assistance of others or the use of expensive electronics. Instead, he contends that coping mechanisms suffice to provide the visually impaired with all of the access that section 504 requires.

Few courts have considered whether the visually impaired have meaningful access where information is exclusively provided in a format readable only by the sighted, perhaps because federal regulations implementing section 504 and Title II of the ADA have expressly required accommodations.[15]

---

[15] For example, Treasury Department regulations require it to "furnish appropriate auxiliary aids where necessary to afford an individual with handicaps an equal opportunity to participate in, and enjoy the benefits of, a program or activity conducted by the agency," 31 C.F.R. § 17.160(a)(1), including "Brailled materials, audio recordings and other similar services and devices," *id.* § 17.103(c). Other departments, such as Homeland Security, Agriculture, and Commerce, have similar provisions in their regulations. *See* 6 C.F.R. §§ 15.60, 15.3(a); 7 C.F.R. § 15b.27(c); 15 C.F.R. § 8b.4. The Justice Department imposes similar requirements on state and local governments under the ADA, *see* 28 C.F.R. §§ 35.104, 35.160, and has specifically indicated that the "[u]se of printed information alone" is insufficient, DEPARTMENT OF JUSTICE, ADA TITLE II TECHNICAL

However, the Seventh Circuit has held that under section 504 public schools must provide examinations in a format accessible to the visually impaired. *Brookhart v. Ill. State Bd. of Educ.*, 697 F.2d 179 (7th Cir. 1983). Its rationale was straightforward: A student "who is unable to disclose the degree of learning he actually possesses because of the test format or environment would be the object of discrimination solely on the basis of his handicap." *Id.* at 184; s*ee also Martin v. Metro. Atlanta Rapid Transit Auth.*, 225 F. Supp. 2d 1362, 1377 (N.D. Ga. 2002); *cf. Camarillo v. Carrols Corp.*, 518 F.3d 153, 156-58 (2d Cir. 2008).

Although the cases addressing meaningful access are necessarily fact-specific, they do reflect, in light of Supreme Court guidance, a general pattern: Where the plaintiffs identify an obstacle that impedes their access to a government program or benefit, they likely have established that they lack meaningful access to the program or benefit. By contrast, where the plaintiffs seek to expand the substantive scope of a program or benefit, they likely seek a fundamental alteration to the existing program or benefit and have not been denied meaningful access. For instance, the physically impaired lack meaningful access where mass transit or public buildings do not provide wheelchair access, *see, e.g.*, *Ability Ctr.*, 385 F.3d at 910; *United States v. Bd. of Trs. for the Univ. of Ala.*, 908 F.2d 740, 751 (11th Cir. 1990); *Dopico v. Goldschmidt*, 687 F.2d 644, 652-53 (2d Cir. 1982), and deaf individuals lack meaningful access to government activities or programs without the provision of interpretive assistance, *see, e.g.*, *Randolph*, 170 F.3d at 858; *Rothschild v. Grottenthaler*, 907 F.2d 286, 291 (2d Cir. 1990); *Bd. of Trs. for the Univ. of Ala.*, 908 F.2d at 748. As the Second Circuit explained in *Dopico*:

---

ASSISTANCE MANUAL II-3.3000 (1993).

> The existing barriers to the 'participation' of the wheelchair-bound are incidental to the design of facilities and the allocation of services, rather than being integral to the nature of public transportation itself, just as a flight of stairs is incidental to a law school's construction but has no bearing on the ability of the otherwise qualified handicapped student to study law.

687 F.2d at 653. On the other hand, section 504 "does not mandate the provision of new benefits." *Rodriguez v. City of New York*, 197 F.3d 611, 619 (2d Cir. 1999); *see also Crawford*, 115 F.3d at 486. In *Choate*, the Supreme Court determined that the state was not required to expand its Medicaid benefits "simply to meet the reality that the handicapped have greater medical needs." 469 U.S. at 303; *see also Modderno v. King*, 82 F.3d 1059, 1062 (D.C. Cir. 1996); *Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557, 561 (7th Cir. 1999). Similarly, in *Jones v. City of Monroe*, 341 F.3d 474 (6th Cir. 2003), the Sixth Circuit concluded that the city had not denied meaningful access to free parking in denying a special privilege to a disabled resident to park near her office. Viewed as a challenge to the scope of a non-discriminatory program, the court stated that the "benefit that [the city] is providing to all of its citizens, including [the plaintiff], is free downtown parking at specific locations; it is not free downtown parking that is accessible to wherever a citizen, disabled or non-disabled, chooses to go or work." *Id.* at 479.

Under this analytical approach, it is clear that the Council seeks only to remove an obstacle that the visually impaired confront in using paper currency, and not, as in *Choate* and *Jones*, to obtain a substantively different benefit than is already provided by the U.S. currency system. U.S. currency, which has constitutional underpinnings, *see* U.S. CONST. Art. 1 § 8, is

intended to be "the universal medium or common standard, by a comparison with which the value of all merchandise may be ascertained," JOSEPH STORY, 3 COMMENTARIES ON THE CONSTITUTION § 1113.[16] The current design of paper money springs from the world of the sighted. Upon casual inspection, anyone with good vision can readily discern the value of U.S. currency; yet even the most searching tactile examination will reveal no difference between a $100 bill and a $1 bill. The Secretary has identified no reason that requires paper currency to be uniform to the touch. Instead, the fact that U.S. paper currency does not include features that are detectable by the

---

[16] *See also* ARISTOTLE, NICOMACHEAN ETHICS, Book 5, ch. 5 (W.D. Ross trans., 1908) (350 B.C.) ("[A]ll things that are exchanged must be somehow comparable. It is for this end that money has been introduced. . . ."). Founding fathers believed that U.S. currency should be readily usable by the public, *see* GRAND COMM. OF THE CONTINENTAL CONG., PROPOSITIONS REFLECTING THE COINAGE OF GOLD, SILVER AND COPPER 1 (1785) ("CONTINENTAL CONGRESS COMMITTEE REPORT") ("The money of the United States should be equally fitted to all."), and easy identification of the value of currency was considered one of its crucial characteristics. In a letter to the Continental Congress, Secretary of the Treasury Robert Morris explained that the purpose of coining money was "in order that the weight and fineness might be known at the first view, and of consequence the value be instantly ascertained." Letter from Robert Morris to Continental Congress (Jan. 15, 1782), *reprinted in* CONTINENTAL CONGRESS COMMITTEE REPORT at 3; *see also* CHARLES DE MONTESQUIEU, 22 SPIRIT OF THE LAWS § 2 (Thomas Nugent trans., 1752) (1748) (noting that governments create standardized money so that its value "may be known by inspection only"). Morris proceeded to examine means of making currency "perfectly intelligible to the whole People," advocating a currency that could be easily divisible to enable ease of use by "the great mass of people. Wherever such things require much labor, time and reflection, the greater number who do not know, are made the dupes of the lesser number who do." MORRIS, *reprinted in* CONTINENTAL CONGRESS COMMITTEE REPORT at 5.

visually impaired appears to have been a result of the type of "thoughtlessness and indifference," *Choate*, 469 U.S. at 295, that Congress targeted under section 504.

Moreover, the centrality to the Rehabilitation Act of empowering the disabled to engage in economic activity imbues the accessibility of currency with special importance. The visually impaired can hardly be "empower[ed] . . . to maximize [their] employment, economic self-sufficiency, independence, and inclusion and integration into society," 29 U.S.C. § 701(b)(1), if in everyday transactions they cannot use the paper currency that they possess without the assistance of third persons. Where the basic task of independently evaluating the worth of currency in excess of 99 cents is difficult or impossible, the visually impaired are forever relegated to depend on "the kindness of strangers" to shop for groceries, hire a taxi, or buy a newspaper or cup of coffee.

We need not define precisely the severity of the deprivation that a plaintiff must experience in accessing a program, benefit, or service to demonstrate a denial of meaningful access. As sister circuits have recognized by requiring public infrastructures to be wheelchair accessible, *see, e.g.*, *Ability Ctr.*, 385 F.3d 901; *Bd. of Trs. for the Univ. of Ala.*, 908 F.2d 740; *Dopico*, 687 F.2d 644, the Rehabilitation Act's emphasis on independent living and self-sufficiency ensures that, for the disabled, the enjoyment of a public benefit is not contingent upon the cooperation of third persons. On this record, the Secretary is hard-pressed to overcome the Council's showing that the visually impaired are denied meaningful access to U.S. paper currency, and his attempts to do so are unpersuasive.

First, the Secretary contends that because the visually impaired have developed coping mechanisms for using paper currency, whether by relying on third parties, purchasing

expensive computer equipment, or folding corners of paper currency in a particular manner to distinguish denominations, they are not denied meaningful access under section 504. The Secretary also notes that the use of credit cards affords an alternative means for the visually impaired to engage in commerce.

But coping mechanisms and alternate means of participating in economic activity do not address the scope of the denial of access that the Council has shown. The Secretary's argument is analogous to contending that merely because the mobility impaired may be able either to rely on the assistance of strangers or to crawl on all fours in navigating architectural obstacles, *cf. Tennessee v. Lane*, 541 U.S. 509 (2004), they are not denied meaningful access to public buildings, *see, e.g.*, *Chaffin v. Kan. State Fair Bd.*, 348 F.3d 850 (10th Cir. 2003); *cf. United States v. Edward Rose & Sons*, 384 F.3d 258 (6th Cir. 2004). Such dependence is anathema to the stated purpose of the Rehabilitation Act, 29 U.S.C. § 701(b); *see also J.D. v. Pawlet Sch. Dist.*, 224 F.3d at 70, and places the visually impaired at a distinct disadvantage in two-way transactions involving paper currency because they can neither control the actions of those with whom they deal nor independently discern whether the paper currency they receive is correct. Instead they are compelled to rely on the honesty and carefulness of sighted individuals who often are on the opposite side of a financial transaction. Further, credit cards do not provide an adequate substitute because they have not replaced cash in many daily transactions and may pose challenges similar to those posed by paper currency if the visually impaired cannot verify the charged amounts stated in the receipts. The availability of credit cards also does not overcome obstacles for the visually impaired in securing certain employment opportunities, such as various entry-level jobs.

Moreover, the courts have recognized that the mere ability of the disabled to spend substantial sums of money to overcome obstacles attendant to a government benefit or program does not eliminate a denial of meaningful access under section 504. For example, in *Rothschild*, the Second Circuit concluded that deaf parents were denied meaningful access under section 504 to certain school activities when the school refused to provide interpreters, even though the parents had previously paid for interpreters for some events. 907 F.2d at 291. The court reasoned that it was "solely the Rothchilds' inability, as deaf persons, to effectively communicate with teachers and other School District personnel that prevents their participation in . . . School District activities." *Id.* It followed that they were "being unfairly 'excluded from participation in a federally funded program solely by reason of [their] handicap.'" *Id.* (quoting *Davis*, 442 U.S. at 405) (alteration in original).

Second, the Secretary contends that the visually impaired have not been denied meaningful access to U.S. paper currency in view of the absence of evidence of their being frequently defrauded. A somewhat astounding proposition on its face, the Secretary implies that criminal victimization is a necessary predicate for the disabled to invoke the rights protected under section 504. However, section 504 "is intended to insure that qualified individuals receive services in a manner consistent with basic human dignity." *Helen L. v. DiDario*, 46 F.3d 325, 335 (3d Cir. 1995).

Finally, the Secretary contends that the district court's conclusion that meaningful access is denied if the visually impaired "cannot accurately identify paper money without assistance," *Am. Council of the Blind*, 463 F. Supp. 2d at 59, is without legal foundation. As a response to the Secretary's argument that coping mechanisms adopted by the visually impaired constituted meaningful access, however, the district

court's statement is not fairly read as foreclosing reliance on technological auxiliary aids, such as a portable currency reader. Courts have held that government-provided interpretive services can provide meaningful access to the disabled, *see Randolph*, 170 F.3d 850; *Rothschild*, 907 F.2d 286; *Bd. of Trs. for the Univ. of Ala.*, 908 F.2d 740,[17] although there is no occasion for us to address whether inexpensive, commercially provided auxiliary aids could satisfy the Secretary's statutory obligation to ensure meaningful access to the critical government programs for which Congress has assigned him responsibility.

## B.

The district court rejected the Secretary's affirmative defense that accommodating the visually impaired would impose an undue burden. *Am. Council of the Blind*, 463 F.

---

[17] Neither *Bird v. Lewis & Clark College*, 303 F.3d 1015 (9th Cir. 2002), nor *Nelson v. Miller*, 170 F.3d 641 (6th Cir. 1999), relied on by the Secretary, support the proposition that a disabled individual has meaningful access when dependent on assistance from strangers. In *Bird v. Lewis & Clark College*, 303 F.3d 1015 (9th Cir. 2002), the claim was made that a travel-abroad program had violated section 504 and Title III of the ADA by making insufficient accommodation for a disabled student. The Ninth Circuit concluded that the hiring of two helpers, provision of alternate transportation and lodging, and purchase of a second wheelchair and special showerhead were sufficient accommodations provided by the school because "'when viewed in its entirety, [the program] is readily accessible to and usable by individuals with disabilities.'" *Id.* at 1021 (quoting *Barden v. City of Sacramento*, 292 F.3d 1073, 1075-76 (9th Cir. 2002)). In *Nelson v. Miller*, 170 F.3d 641 (6th Cir. 1999), the plaintiff disclaimed any argument that section 504 required the provision of Braille ballots, *id.* at 650, and the court's decision turned on its interpretation of a state's constitution rather than section 504.

Supp. 2d at 62.[18] On appeal, the Secretary contends, not that he does not bear the burden, but rather that the district court "plainly erred in holding categorically that none of the plaintiffs' proposals to modify the currency would impose an undue burden." Appellant's Br. at 34. We conclude that the Secretary has failed to establish that implementing all accommodations would be unduly burdensome and that therefore the grant of partial summary judgment for the Council was appropriate.

First, the Secretary misconstrues section 504, contending that the district court improperly validated the most expensive accommodation. *See* Appellant's Br. at 36. However, liability under section 504 requires only that the least burdensome accommodation not be unduly burdensome. The Secretary has discretion to chose from a range of accommodations, and his failure to demonstrate that all accommodations found by the district court to be facially reasonable would pose an undue burden presents no occasion for us to address any particular accommodation.

Second, the district court provided a fulsome analysis of the deficiencies in the financial aspects of the Secretary's evidence that we need only highlight here. *See Am. Council of the Blind*, 453 F. Supp. 2d at 60-62. Suffice it to note, the estimates of costs, all of which were submitted by the Bureau, appear inflated because they include alteration of the $1 bill. *See* Ferguson S.J. Decl. ¶ 11; *Am. Council of the Blind*, 463 F. Supp. 2d at 61 n.13.

---

[18] In the related context of analyzing the concept of "undue hardship," used to qualify an employer's obligation to accommodate disabled employees under section 501 of the Rehabilitation Act and Title I of the ADA, the Seventh Circuit suggested that the modifier "undue" implies a comparison between the cost of an accommodation and the resources of the defendant. *Vande Zande,* 44 F.3d at 542-43; *see also Barth*, 2 F.3d at 1186-87.

Approximately half of the paper currency that the Bureau prints in any given year are $1 bills. *See.* Ferguson S.J. Decl. ¶ 13; Def.'s Resp. to Pls.' Statement of Material Facts Not in Dispute ¶ 69, S.J.A. 717. The Secretary also suggested that the accommodations identified by the Council could require modifications that would result in the need for more frequent replacement of paper currency, further increasing costs. *Am. Council of the Blind,* 463 F. Supp. 2d at 60-61.[19] However, the district court noted the absence of any statistically significant evidence from the Secretary on reduction in life span of the banknotes, *id.*, and on appeal the Secretary has not challenged this finding. Although the Bureau stated that tactile features could reduce the useful life of currency, *see* Ferguson S.J. Decl. ¶ 7; *see also* 1983 BEP STUDY at 16, other currencies continue to use them and the Secretary's reference to a May 2007 paper about the durability of the embossed feature on Canadian currency, *see* Reply Br. at 21,[20] calls into question only the efficacy of that particular kind of tactile feature; it does not indicate that embossing reduces the usable life of the currency

---

[19] Although the Secretary does not address longevity in his opening brief, and typically the argument would be forfeited, *see Bd. of Regents of the Univ. of Wash. v. EPA*, 86 F.3d 1214, 1221 (D.C. Cir. 1996), the Council addressed the subject in its brief, Appellee's Br. at 47-49, to which the Secretary replied, Reply Br. at 20-21, and our review of the grant of partial summary judgment is *de novo*, *see Tao*, 27 F.3d at 638.

[20] Charles Spencer & Dan Dupuis, Bank Note Accessibility Features for the Blind and Vision Impaired: The Canadian Experience (May 2007) (unpublished paper presented by Canadian Bank of Canada officials at a Currency Conference, Bangkok, Thailand), Addendum to Reply Br.

and expressly notes that methods exist to improve durability.[21]

Third, because other currency systems accommodate the needs of the visually impaired, the Secretary's burden in demonstrating that implementing an accommodation would be unduly burdensome is particularly heavy. The Secretary has not explained why U.S. paper currency is so different or the situation of the Bureau so unique that the costs associated with identified accommodations would constitute an undue burden. Although "[a]ny change to the design of U.S. currency would undoubtedly require a substantial investment of labor, time, and money," *Am. Council of the Blind*, 463 F. Supp. 2d at 62, the Secretary does not challenge the district court's findings that the Bureau's cost estimates for the design modification that the Council has identified would constitute a "small fraction of [the Bureau's] annual expenditures,"[22] and that even these costs could be further reduced were a new feature for the visually impaired incorporated into a redesign planned for other purposes, such as occurred in 1996 and 2004 to address counterfeiting, *id.* Independent of this litigation, the Bureau has

---

[21] Our dissenting colleague notes that the tactile features highlighted by the Council were not included "in the complaint until three and a half years after the case began, after discovery closed." Dissenting Op. at 5 n.7. However, the Secretary advances no contention that he was prejudiced by the amended complaint, the Director of BEP has estimated the cost of each accommodation (except raised intaglio printing), *Am. Council of the Blind*, 463 F. Supp. 2d at 61, and the Secretary did not seek additional discovery.

[22] The district court observed that the Bureau "is not financed by appropriations from Congress, but by a revolving fund that is replenished by the sale of its products - currency and postage stamps - to other federal entities. In 2004, the [Bureau] earned revenues of $525 million. . . ." 463 F. Supp. 2d at 54; *see also* 2005 New Currency Budget, Dist. Ct. Docket 60-9.

stated that it "expects to redesign U.S. currency every seven to ten years." BUREAU OF ENGRAVING & PRINTING, CHIEF FINANCIAL OFFICER, PERFORMANCE & ACCOUNTABILITY REPORT 7 (2004), Dist. Ct. Docket 35-41. In view of the costs of these prior redesigns,[23] even the inflated costs proffered by the Secretary are not so out of line as to suggest an undue burden. Although the Secretary must assess priorities, section 504 is no less of a statutory command than the one prompting the Secretary to expend large sums of money to combat counterfeiting.

As regards the burden on third parties, the Secretary and various studies have recognized that alteration of the size of denominations could impose third-party costs. *See, e.g.*, 1983 BEP STUDY at 16; *see also* Amicus Br. of the National Automatic Vending Machine Association ("NAMA"). The Secretary acknowledges, however, that "the burdens imposed on other entities or the public are not usually considered in determining whether proposed changes to accommodate the disabled are reasonable under section 504." Appellant's Br. at 37 n.9. He nonetheless urges the court to consider "external, third party costs" because of "unique circumstances . . . [in which] [s]ignificant changes to currency will have an obvious and immediate impact on all entities that process currency, and the costs of any such changes will ultimately be borne by the public." *Id*. Assuming without deciding that such considerations are relevant in determining liability under section 504, we conclude that the Secretary has failed to demonstrate a material issue of disputed fact on the severity of each facially

---

[23] The cost of the 1996 redesign was approximately $34 million and increased the annual cost of producing currency by over $31 million. The cost for the 2004 redesign was over $113 million and increased the annual cost of producing currency by more than $25 million. Ferguson Supplemental Decl. ¶¶ 4-7.

reasonable accommodation on third parties, including cash processors, cash registers, vending machines, and change machines.

The district court found that the record contained "little information about the effect of currency changes on third parties" and that the existing evidence was "inconclusive." *Am. Council of the Blind*, 463 F. Supp. 2d at 60 n.10. A partially disclosed survey by NAMA was limited to eight firms and addressed only the addition of Braille and alteration of the size of currency. Further, "it appear[ed] to have been conducted under the assumption . . . that plaintiffs seek changes to the \$1 bill." *Id*. The district court also found that "other respondents, particularly those that conduct business outside the U.S., stated that changes would not be difficult to implement." *Id*.

The Secretary does not contest these findings on appeal, asserting instead that "it is self evident that . . . changes would impose significant new burdens on . . . various entities in the private sector." Appellants' Br. at 38. Assertions are not evidence and thus cannot create a material issue of fact in dispute to justify reversal here. Moreover, future redesigns of currency for security purposes are already likely to require retooling of currency-handling machinery. *See* Amicus Br. of NAMA at 14-16. The Secretary does not suggest that third-party costs could not be lessened or eliminated if incorporated into a larger redesign.

Finally, the contention that the district court impermissibly curtailed the Secretary's discretion by stating that "design changes that would accommodate plaintiffs who have low vision, but who are not blind . . . [are] at best, a half-measure," *Am. Council of the Blind*, 463 F. Supp. 2d at 59 n.9, is unpersuasive. The district court expressly acknowledged the Secretary's broad discretion to determine how to come into

compliance with section 504. *Id.* at 62. Because the Secretary has not demonstrated that accommodating those with no vision would constitute an undue burden, however, the alteration of currency to assist only those with low vision would not satisfy his obligation under section 504 by continuing to deny the benefits of currency to others because of their visual impairment.

Our dissenting colleague postulates a different litigation strategy that the Secretary could have chosen but did not, contending that the Council failed to establish the "effectiveness" of identified accommodations other than changing the size of money. Dissenting Op. at 2-4. The Secretary did not argue, either in the district court or on appeal, that summary judgment was inappropriate because the Council failed to establish that tactile features would not enable the visually impaired to denominate bills and conceded that individuals with no vision can detect the micro-perforation, foil, or embossed symbols included on the Euro, Swiss Franc, and Canadian Dollar.[24] Pls.' Statement of Material Facts Not in

---

[24] The excerpts from the Statement of Facts in the Secretary's brief that are relied upon by our dissenting colleague, Dissenting Op. at 3-4, are not to the contrary and "allud[ing] to the factual basis for [a] claim in the statement of facts" does not raise a legal argument. *AMSC Subsidiary Corp. v. FCC*, 215 F.3d 1154, 1161 n. ** (D.C. Cir. 2000). The Secretary describes the 1995 NRC Report as including four recommendations and concludes that of the four, only changing the size of money would help those with no vision. Appellant's Br. at 7-8. However, tactile features were not among the four recommendations, and the Report "urge[d]" research into both durable tactile features and mirco-perforation. 1995 NRC Study at 5; *see supra* n.4. Further, the Secretary's statement that the Bureau has previously concluded that visually disabled individuals "could not identify [micro-perforation] with sufficient accuracy for currency denomination" and that the "pattern could be altered or simulated

Dispute ¶¶ 46, 54, 59, S.J.A. 695, 697, 698; Def.'s Resp. to Pls.' Statement of Material Facts Not in Dispute ¶¶ 46, 54, 59, S.J.A. 714, 715. Neither did the Secretary dispute the feasibility of any design features other than raised intaglio printing. *See* Def. Response to Pls.' Third and Fourth Set of Interrogatories and First Request for Admission at 6-7, Joint Appendix 529-30; *Am. Council of the Blind*, 463 F. Supp. 2d at 61. Instead, the Secretary relied on costs to establish that implementing all accommodations would be unduly burdensome. On appeal, the Secretary does not challenge the district court's analysis of the cost data, contending only that the district court erred in concluding that this evidence was insufficient. For our dissenting colleague to conclude that "my colleagues have not identified a single accommodation that is undisputably 'reasonable, effective, and feasible,' and for which there is no material issue about an undue burden," Dissenting Op. at 4 (citation omitted), is to rewrite the record and the manner in which the Secretary has chosen to present his challenge on appeal. Whereas the Secretary has chosen to defend on the ground that he cannot be held liable under section 504 because implementing each identified accommodation would pose an undue burden, our dissenting colleague has focused on legal arguments antecedent to the undue burden issue in an attempt to relitigate the Secretary's case for him and purported to find disputed facts with respect to issues the Secretary has not raised.

---

easily," Appellant's Br. at 9-10, does not change his concession that micro-perforation "could provide a meaningful denomination cue merely by virtue of its location on the banknote, even if the specific micro-perforation pattern is not itself sufficient to provide denomination information," nor the fact that Swiss currency successfully incorporates such a feature. Pls.' Statement of Material Facts Not in Dispute ¶¶ 44, 46 S.J.A. 694-95; Def.'s Resp. to Pls.' Statement of Material Facts Not in Dispute ¶¶ 44, 46 S.J.A. 714. Finally, the 2007 Canadian study, *see supra* n. 20 & accompanying text, was not before the district court.

We hold that the Council has demonstrated both the denial of meaningful access and the availability of facially reasonable accommodations that are feasible and efficacious, and that the Secretary has not demonstrated that implementation of every such accommodation would involve an undue burden. Accordingly, we affirm the grant of partial summary judgment on the Secretary's liability under section 504, and we remand the case for the district court to address the Council's request for injunctive relief.

RANDOLPH, *Circuit Judge*, dissenting: We should have dismissed this interlocutory appeal. The case arrived here after the district court, on its own motion, certified that an otherwise unappealable order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Another panel directed the parties to brief the question whether we should exercise our discretion to accept the appeal. *See Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475 (1978). The plaintiff – the American Council of the Blind – opposed the appeal, rightly in my view, on the grounds that the "district court was notably silent as to what remedy it would ultimately order," that the issue of undue burden is "purely hypothetical" at this stage, that future proceedings might render the issue moot, and that nothing this court could say on the issue would advance the termination of the litigation. Br. for Appellee at 60-61 (citing *Control Data Corp. v. International Business Machines Corp.*, 421 F.2d 323, 325 (8th Cir. 1970)). The Secretary agrees that "the question whether <u>specific</u> changes to the currency are unduly burdensome is 'hypothetical' because the district court has not yet ordered any particular changes." Reply Br. for Appellant at 19. As a result, "the question whether [a tactile] feature would be unduly burdensome is not properly before this Court on interlocutory appeal." *Id.* Yet the majority plunges ahead to decide issues neither party thinks are before us.

The product of this ill-conceived appeal is proof positive that it should never have been allowed. According to the majority opinion, the Secretary loses because he failed to carry his burden of proving that every possible adjustment – every accommodation – would amount to an "undue burden." Maj. Op. at 16. This formulation, and others like it in the opinion, display a fundamental misconception. The Secretary had no burden of the sort the majority describes. To decide on summary judgment that the Secretary violated the Act, there had to be an *effective* accommodation the government could

implement without imposing an "undue burden" on itself or the private sector.[1] And the effectiveness of the accommodation had to be established as an undisputed material fact. Yet with one exception, the district court never specified which of plaintiff's proposals would be effective and neither have my colleagues. The one exception is changing the size of bills according to their denomination.[2] While this might be effective (and might require an Act of Congress),[3] material facts were in dispute regarding the burden of implementing such a system. The government put forth evidence indicating that it would cost

---

[1] Failure to implement an ineffective accommodation is not a violation of the Rehabilitation Act. *See Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 409-10 (1979).

[2] Plaintiff also sought "a permanent injunction mandating that [the Secretary] diligently pursue the development of an inexpensive portable electronic device which is capable of both accurate and rapid denomination of banknotes." First Amended Complaint for Declaratory and Injunctive Relief 36 (Nov. 23, 2005). Such a device might be effective, but there is no evidence that it could be produced at an affordable price.

[3] Congress has prohibited the Treasury from redesigning the $1 bill, which is why the Council does not seek to change its size. Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, sec. 6, div. D, tit. I, § 113, 121 Stat. 1844, 1978 (2007). If euro banknotes are any guide, progressively increasing the size of American currency from the $1 bill on up would lead to huge bills in the higher denominations. The largest euro banknote (€500) is 40 millimeters longer and 20 millimeters taller than the smallest (€5), yet the $1 bill is already 36 millimeters longer and 4 millimeters taller than the €5 banknote. ECB: Banknotes, http://www.ecb.int/bc/euro/banknotes/html/index.en.html (last visited May 8, 2008).

billions of dollars to alter private vending machines[4] and ATMs and that rendering current wallets and purses obsolete would impose additional costs. A member of the plaintiff's Advocacy Services Committee admitted that varying the size of the currency "really does pose an undue burden on business." Defendant's Renewed Motion to Dismiss or for Summary Judgment 29 (Aug. 31, 2005). The Rehabilitation Act is not violated if the proposed accommodation imposes an "undue burden," *see Barth v. Gelb*, 2 F.3d 1180, 1187 (D.C. Cir. 1993), and billions of dollars may well constitute such a burden, even though a good portion of the amount would fall on the private sector. *See Am. Pub. Transit Ass'n v. Lewis*, 655 F.2d 1272, 1278 (D.C. Cir. 1981) (holding that the Rehabilitation Act cannot justify federal regulations that "impose extremely heavy financial burdens on local transit authorities").

I do not understand my colleagues' double negative that "[t]he Secretary did not argue, either in the district court or on appeal, . . . that tactile features would not enable the visually impaired to denominate bills." Maj. Op. at 31. In his opening brief, the Secretary cited a study by the National Academy of Sciences for the proposition that "banknote size that differs with denomination is the only [alteration] applicable to the needs of blind people." Br. for Appellant at 8. The Secretary went on to argue that embossed dot patterns have "insufficient durability to approximate the average length of time required for notes to remain in circulation." *Id.* at 9. He also noted that a study of microperforation by the Bureau of Engraving and Printing found that "individuals with disabilities could not identify the perforation patterns with sufficient accuracy for currency

---

[4] There are approximately 7,000,000 food and beverage vending machines in the United States; by one estimate, it would cost $3.5 billion to retool or replace these machines if the size of different bills were progressively increased.

denomination, and analysis also showed that this feature was *unlikely to be effective* or durable because the perforation pattern could be altered or simulated easily." *Id.* at 9-10 (emphasis added). And the Secretary's reply brief reproduced a study showing that blind testers could not identify 33.8% of Canadian banknotes that had circulated for a year. Reply Br. for Appellant at 21. The same study found a general problem with tactile features: "Diabetes is one of the leading causes of vision loss and is often accompanied by a loss of sensitivity in the fingertips." Addendum to Reply Br. for Appellant at 5.[5] The Secretary made these arguments before the district court as well.[6] In addition, the Secretary offered evidence to the district court that the ink of an embossed numeral would rapidly rub off during circulation, making this feature useless to the blind. Defendant's Statement of Material Facts as to Which There Is No Genuine Issue ¶ 63 (Aug. 31, 2005).

In short, my colleagues have not identified a single accommodation that is undisputedly "reasonable, effective, and feasible," Maj. Op. at 15, and for which there is no material issue about an undue burden. They do not know what if anything should be implemented as an accommodation and neither does the American Council of the Blind, the Treasury,

---

[5] Even if the Secretary had not disputed on appeal the effectiveness of various measures, it is absurd to suggest – as the majority does – that the parties' arguments on the merits somehow constrain our discretion whether to hear the appeal at all.

[6] *E.g.*, Defendant's Responses to Plaintiffs' Third and Fourth Sets of Interrogatories and First Request for Admissions 1-2 (Aug. 31, 2005). The effectiveness of a foil feature also is uncertain. The 5, 10, and 20 euro banknotes have a foil feature that differs in shape and position from the feature on the 50, 100, 200, and 500 euro banknotes. But no evidence showed that such a feature would enable the blind to distinguish each denomination of American currency.

the district court, or the National Federation of the Blind (who supports Treasury).[7] Yet my colleagues affirm the grant of summary judgment against the Secretary. In doing so they state that because the Secretary did not show that every possible measure would impose an undue burden, he is barred on remand from showing that any particular measure would have this effect. Maj. Op. at 29-30, 33. This cannot possibly be correct. The district court did not believe its ruling meant any such thing and neither did the plaintiff, as its statements quoted earlier demonstrate. Further evidentiary proceedings necessarily must be held before this case can be brought to an end. The case is therefore not even close to being in the proper shape for reasoned appellate decision-making. When faced with "a question of law which turns on a thorough examination of the facts," we should be "reluctant to rely on what may turn out to be an incomplete record to clarify legal doctrine for the district court's guidance." *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 866 (2d Cir. 1996).

---

[7] During discovery, the Council's complaint explicitly sought only two tactile changes to the currency: "denomination numerals indicated by Braille symbols and raised printing on the banknote itself" and "varying the length [and] height . . . of banknotes." Complaint for Declaratory and Injunctive Relief 17 (May 3, 2002). The complaint said nothing about microperforation, foil, electronic currency readers, or raised intaglio printing. Although the parties may have mentioned these possible changes during discovery, the Council did not add them to the complaint until three and a half years into the case, after discovery closed. First Amended Complaint for Declaratory and Injunctive Relief ¶ 124 (Nov. 23, 2005).